**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Woody F. LEMONS, Defendant–Appellant.**

**No. 90–1287.**

United States Court of Appeals,
Fifth Circuit.

Aug. 27, 1991.

Michael P. Gibson, Burleson, Pate & Gibson, Dallas, Tex., for defendant-appellant.

Robert E. Hauberg, Jr., Sara Criscitelli, U.S. Dept. of Justice, Fraud Section, Crim. Div., Washington, D.C., Marvin Collins, U.S. Atty., Dallas, Tex., for plaintiff-appellee.

Before GOLDBERG, SMITH, and BARKSDALE, Circuit Judges.

PER CURIAM:

Woody F. Lemons was convicted on nine counts based on the bank fraud statute, 18 U.S.C. § 1344 (executing a scheme to defraud a federally insured financial institution), as well as on four related counts. His appeal turns primarily on the reach of § 1344. However, he does not appeal his convictions on five counts, including the first two for bank fraud (which concern several million dollars). Moreover, for those he does challenge, he principally claims (1) that he could not be convicted under § 1344, because he did not receive the money, or other benefit, in issue until after the statutorily proscribed bank fraud scheme was completed and (2) multiplicity. And, he challenges his pre-Sentencing Guidelines total sentence of 30 years imprisonment. We AFFIRM IN PART and REVERSE and VACATE IN PART.

I.

In 1972, Lemons joined Vernon Savings & Loan Association, a state chartered, federally insured and regulated institution, and became president in 1976. Vernon was a regional operation, with its main office in Vernon, Texas, and branches in small nearby communities. In 1982, Vernon was purchased by Don Dixon; and Lemons became chief executive officer and chairman of the board. Upon deregulation of the savings and loan industry, Vernon expanded into commercial real estate, primarily through its new Dallas office, where Lemons spent much of his time.

Lemons' indictment arose out of a $46 million real estate project in Arlington, Texas, known as the Arlington Waterway property, a planned residential and commercial development on 380 acres. In April 1984, a group of buyers contracted to buy the partially developed land for $14 million, but it was unable to secure financing for the purchase.

Ron Finley, a Vernon customer, became interested in the property and enlisted the aid of Gipp Dupree, a Dallas real estate broker. Dupree had an existing relationship with Vernon; during 1985, he brokered over $100 million in loans for it. His standard broker's fee was one percent of the total loan amount.

In September 1985, Dupree and Finley met with Vernon officers; and a loan in the range of $40–60 million was discussed. Arlington Waterway was appraised at several million dollars above the actual purchase price. Accordingly, had Vernon funded 100% of the appraised value, there would have been approximately $8–12 million in excess funding, the difference between the cost of the project and the loan amount. As part of the proposal, Dupree offered to use some of the excess funding to help Vernon rid itself of Real Estate Owned (REO)—foreclosed property on non-performing loans, especially on undeveloped land. A sale of REO property would improve Vernon's capital position and provide funds for new loans.

In November 1985, the group assigned its contract at no cost to Marathon Properties, a company owned by Dupree. As a part of the assignment, the owners required a $100,000 letter of credit, which was issued by Vernon and guaranteed by Dupree and Finley. An extension of the contract was obtained until January 15, 1986.

While reviewing the project, it was determined that Finley could not be the borrower, because he was already indebted to Vernon and the Arlington Waterway loan would exceed Vernon's loan to one borrower limit. It was agreed that another borrower would have to replace him. Finley introduced Dupree to Michael Blubaugh, a real estate developer who was not indebted to Vernon. Blubaugh expressed an interest in the waterway project and was introduced to Vernon officials.[1]

In December 1985, the loan was presented to Vernon's board of directors, but no mention was made of either excess funding or the loan amount containing an assignment fee or commission to Dupree for brokering the transaction. The board approved a $52 million loan, conditioned upon additional financial underwriting work.

In late January 1986, Dupree, Blubaugh, and Lemons agreed that Dupree would receive a $3.5 million fee in exchange for the assignment of his interest in the contract through Marathon Properties and a 1% commission as loan broker. Dupree had inserted Marathon into the chain of title at no cost. One Vernon officer described this assignment as a "flip". A flip occurs when there is a party in the chain of title that marks up the price without closing the property, so that no value is added to the property. Lemons told Vernon vice president John Hill that Dupree had agreed to make half of the fee available to Vernon for REO. Hill also testified that, in addition, Dupree agreed to put half of the fee in a new mortgage business Lemons hoped to start. There was no agreement that specific REO property would be purchased.

A new appraisal was performed in February 1986; and the loan was reduced to $46 million, 90% of the appraised value. Several Vernon officers testified that they were concerned about the amount of the loan on the basis of the appraisal and engineering study. Randy Hughes, the Vernon officer responsible for underwriting the loan, presented it to the loan committee in February 1986. The loan gave Vernon a 35% participation in profits on the project, less than Vernon's usual 50%. The loan was initially denied, but was later revived.

---

1. Initially, Blubaugh and Dupree formed a limited partnership, Arlington Waterway Joint Venture, with Blubaugh owning 85%; Dupree, 15%. Prior to closing, Dupree withdrew from the partnership and assigned his interest to Blubaugh.

Hughes continued underwriting the loan with Lemons.

The Arlington Waterway loan, the largest Vernon loan up to that time, was approved by the loan committee in March 1986, but could not be funded until April, due to Federal Home Loan Bank Board (FHLBB) restrictions. The loan closed on April 2, with the first payment of $9.7 million to Blubaugh. Of this initial draw, $2.3 million was paid to Vernon in points and fees; and Blubaugh paid Dupree $1 million in accordance with the earlier agreement and signed a note to Marathon for the $2.5 million balance. Dupree also received $460,000 as his 1% broker fee.

In April 1986, the FHLBB called for the resignations of Lemons and three other Vernon senior officials. (Vernon was closed by regulators in March 1987.) After Lemons' resignation on April 24, 1986, Blubaugh requested a $3.75 million draw, which included the $2.5 million balance on Dupree's assignment fee and $1.25 million to settle claims by the original group of buyers who were threatening suit. Hughes approved the draw request, forwarding it to another Vernon official, Richard Veteto. Veteto authorized disbursement of the $1.25 million, in order to avoid the potential lawsuit, but questioned the $2.5 million payment. Hughes told Veteto that the $2.5 million payment had Lemons' approval. Veteto questioned Lemons about the payment and was informed that the fee was created to allow Dupree to buy Vernon REO property. Lemons also told Veteto that the loan committee was aware of the assignment fee when it approved the loan, although the fee was not a line item on the budget. Because Lemons had resigned by that time, Veteto decided that he lacked authority to approve the payment and declined to fund it.

Only $1 million of the $3.5 million assignment fee was funded to Dupree. Lemons pressed Dupree for half; but Dupree was concerned that the payment would be illegal, because Lemons had resigned from Vernon and had no direct claim to the money. Lemons suggested that Dupree make the payments to him through a third party, and Dupree agreed.

Dupree would not agree to the amount Lemons requested, because Dupree had lent Blubaugh $500,000 in early April and he had tax liability on the $1 million. Lemons agreed to $250,000, but Dupree subsequently deducted other amounts which Lemons owed him. Accordingly, on June 30, 1986, Dupree gave Jack Franks, a real estate consultant who had dealt with Vernon, a check for $212,000, made payable to North Star Group, a company owned by Franks.

Lemons came to Franks on June 30 to receive the $212,000; but Franks advised him that if he gave him a check for the total amount on the same day, the transaction might be questioned. Franks suggested spreading the payments over different transactions over a period of time, and Lemons agreed.

That day (June 30), Franks gave Lemons a $40,000 check written on the account of Parkway Ventures. The payment was identified as a "consulting fee" for four months, at $10,000 a month. That same day, Franks issued a second check, on his North Star account, to Lemons for $22,500, which was identified as a commission payment. And, Lemons' debt to Franks for a Jeep Wagoneer he had purchased from Franks on June 11, 1986, was forgiven, in the amount of $20,000. The debt forgiveness and $22,500 check were purportedly in payment for Lemons' "assistance in obtaining [a] second mortgage" on a home Franks had purchased in Newport Beach.

On July 9, 1986, Franks authorized a $10,000 check on one of his companies to First Equity Mortgage, Lemons' company, designated as a "loan commitment fee". And, on August 6, Franks authorized a check to Lemons for $30,000, which was identified as payment for consulting fees.

Franks still owed Lemons approximately $90,000 of the $212,000; and, in an unrelated business venture, Lemons owed Franks approximately $70,000, due in June 1987. They agreed that the $70,000 debt would be offset against the balance due

Lemons. The remainder was used by Franks for his tax liability on the $212,000.

In addition, during the Arlington Waterway negotiations, Dupree entered into a commission agreement with Lemons on behalf of Vernon to negotiate sales of some Vernon loans. In late December 1985, after Dupree sold a $73 million package of Vernon loans, Lemons asked Dupree to contribute to the expenses of someone who had attempted to broker them; Dupree agreed to pay $9,000.

Lemons asked Jerry Lane, CEO of Shamrock Federal Savings Bank, to assist in collecting the $9,000 from Dupree. At Lemons' request, Lane prepared an invoice on Shamrock letterhead, billing Dupree $9,000 for "consulting services". Lemons forwarded the invoice to Dupree and requested that the check be made payable to First Equity Financial. Dupree complied; and Lemons endorsed the check by typing "First Equity Financial by" and signing it "Jerry Lane", but without his authorization. He then gave the check as partial payment on a vehicle, resulting in its being processed through several banks. (The second, or separate, charged § 1344 scheme concerns this $9,000 check.)

In June 1986, regulators examined the Arlington Waterway loan. In response, Franks prepared a back-dated memo, that reflected Lemons' right to a 10% commission on the second mortgage and included the Jeep as partial payment on the debt. Later, Lemons asked Franks to send a letter, back-dated to December 1986, confirming that the $70,000 debt had been forgiven in exchange for fees that Franks owed Lemons on an identified business transaction. Lemons also prepared a memorandum for Dupree about the $9,000 check and the Arlington Waterway transaction. It explained that Lemons and Franks had been involved in efforts to get the assignment fee funded; that the entire fee was for REO; and that the $9,000 was paid for a legitimate business transaction.

At trial, Lemons denied the allegations of fraud and contested the government's evidence, contending that the payments were for legitimate consulting fees. For execu-

ting a scheme to defraud Vernon, he was convicted on eight counts of bank fraud, in violation of § 1344 (and on counts 1 and 2, also for violation of 18 U.S.C. § 2—aiding and abetting), as follows:

Count 1—authorizing payment to Dupree of a $3.5 million assignment fee from the Arlington Waterway loan proceeds;

Count 2—causing Vernon to fund the Arlington Waterway loan, in the approximate amount of $9.7 million;

Count 3—receiving the $22,500 check from Franks on June 30, 1986;

Count 4—receiving from Franks on June 30, 1986, the forgiveness of the $20,000 debt for the Jeep Wagoneer Lemons purchased from Franks on June 11, 1986;

Count 5—receiving the $40,000 check from Franks on June 30, 1986;

Count 6—receiving the $10,000 check from Franks on July 9, 1986;

Count 7—receiving the $30,000 check from Franks on August 6, 1986; and

Count 8—receiving from Franks in late December 1986, the $70,000 forgiveness of debt.

Lemons was also convicted on the other five counts (including the $9,000 check bank fraud scheme, concerning institutions other than Vernon), as follows: misapplication of funds of a federally insured savings and loan association, by causing Vernon to loan and fund the $9.7 million to the Arlington Waterway project, in violation of 18 U.S.C. §§ 657 and 2 (count 9); conspiracy to defraud the United States, in violation of 18 U.S.C. § 371 (count 10); unlawful participation in a savings and loan transaction, by receipt of the $9,000 check, in violation of 18 U.S.C. § 1006 (count 11); defrauding Texas American Bank and the Howe State Bank, by passing to a third party the $9,000 check containing an endorsement Lemons knew to be forged, in violation of 18 U.S.C. §§ 1344 and 2 (count 12); and unlawful receipt of funds in connection with the business of a savings and loan association, by receipt of the $9,000 check, in violation of 18 U.S.C. § 215(a) (count 13).

Lemons was sentenced to five years imprisonment on each count. The sentences on counts 1, 2, 9, and 10 (first set) were concurrent with each other; the sentences on counts 3, 8, 11, 12, and 13 (second set) were concurrent with each other, but consecutive to the first set; and the sentences on counts 4, 5, 6, and 7 were consecutive to each other and the first two sets, resulting in imprisonment of 30 years. The district court took the restitution issue under advisement.

## II.

Lemons contends: (1) that on counts 3–8, for which he was found guilty of obtaining and receiving payments and debt forgiveness, there was insufficient evidence to support his convictions under § 1344; (2) that there was insufficient evidence for conviction under § 1344 on count 12—execution of a scheme to defraud by forging an endorsement on the $9,000 check; (3) that some of the counts are multiplicitous and should have been dismissed; and (4) that the district court erred in imposing consecutive sentences for some of the counts, because they are multiplicitous, and, in the alternative, abused its discretion in sentencing him to 30 years imprisonment.

## A.

In reviewing the sufficiency of the evidence, we view the evidence in the light most favorable to the government, drawing all reasonable inferences in favor of the jury's verdict, and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Smith*, 930 F.2d 1081, 1085 (5th Cir.1991).

Of the eight challenged counts, seven (3–8 and 12) were brought pursuant to § 1344, which, at the time of the offenses, provided:

> (a) Whoever knowingly executes, or attempts to execute, a scheme or artifice—
>> (1) to defraud a federally chartered or insured financial institution; or
>> (2) to obtain any of the monies, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a federally chartered or insured financial institution, by means of false or fraudulent pretenses, representations, or promises;
> shall be fined not more than $10,000 or imprisoned not more than 5 years, or both.[2]

The statute was "modeled on the present wire and mail fraud statutes which have been construed by the courts to reach a wide range of fraudulent activity." S.Rep. No. 225, 98th Cong., 1st Sess. 378 (1983), *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3519.

In each of counts 1–8 and 12, the indictment tracked the language of § 1344(1), charging that Lemons "knowingly executed and attempted to execute the aforesaid scheme and artifice to defraud" either "Vernon" (counts 1–8) or two other banks (count 12). For example, for counts 1–8, the jury was instructed that the government had to prove beyond a reasonable doubt that: (1) Lemons willfully and knowingly devised a scheme or artifice to defraud Vernon; (2) Vernon's accounts were insured by the FSLIC; and (3) with respect to each count, Lemons, in fact, executed the scheme or artifice to defraud Vernon, as alleged in the indictment. The court instructed that "[t]he terms 'scheme and artifice' include any practice or course of action intended to deceive others and to obtain by some false or fraudulent device or representation money or property...."

Consistent with that jury charge, "[t]he terms 'scheme' and 'artifice' are defined to include, among other things, any fraudulent pretenses or misrepresentations in-

---

**2.** In November 1989, § 1344 was amended to provide for a maximum term of 20 years imprisonment and a fine of $1,000,000. Pub.L. 101–73, Title IX, § 961(k), Aug. 9, 1989, 103 Stat. 500. And, in November 1990, § 1344 was amended again to increase the maximum term to 30 years imprisonment. Pub.L. 101–647, Title XXV, § 2504(j), Nov. 29, 1990, 104 Stat. 4861.

tended to deceive others to obtain something of value, such as money, from the institution to be deceived." *United States v. McClelland,* 868 F.2d 704, 709 (5th Cir. 1989); *see also United States v. Goldblatt,* 813 F.2d 619, 624 (3d Cir.1987) ("scheme to defraud" in § 1344 is not "capable of precise definition"). *See also United States v. Farmigoni,* 934 F.2d 63 (5th Cir.1991), discussed in note 6 *infra; United States v. Briggs,* 939 F.2d 222 (5th Cir.1991).

### 1.

As noted, for the § 1344 counts concerning a scheme to defraud Vernon (counts 1–8), Lemons does not appeal his convictions on counts 1 and 2 (authorizing payment of the $3.5 million assignment fee (count 1) and causing funding of the $9.7 million on the loan, to include $1 million of the undisclosed assignment fee to Dupree (count 2)). Moreover, he challenges the sufficiency of the evidence concerning the convictions on the remaining counts (3–8) in only one respect: he contends that the conduct alleged in those counts occurred *after* the scheme to defraud Vernon was completed and therefore, was not in execution of the scheme—including, that any discussions with Dupree or Franks concerning the receipt of payments occurred after the assignment fee was funded and he had resigned from Vernon.

This contention is in part without merit. The indictment charged that as part of the scheme to defraud Vernon, Lemons "would and did obtain a share of the excess funds for his own personal benefit." The government's proof at trial encompassed his receipt of the money or other benefit as part of that scheme. The district court also instructed the jury, with respect to counts 1–8, that it must find "[t]hat the defendant intended to benefit in his own right from the transaction." The payments or other benefits conveyed by Franks to Lemons were the final step in executing the scheme by which Vernon was defrauded and Lemons attempted to benefit.

Obviously, it is entirely unlikely that Lemons would engage in a scheme merely to see Vernon defrauded. The evidence presented at trial abundantly proved that the acts alleged in counts 3–8 were part of the scheme; it was not complete, or executed, until Lemons received his benefit from the transaction. But, as noted, Lemons' contention only partly misses the mark. As discussed in part II.B., we find only one execution of the scheme. Because Lemons' relief lies in his multiplicity of convictions contention, addressed in part II.B., we need not further address this sufficiency of the evidence point.

### 2.

Lemons also challenges the sufficiency of the evidence on count 12, concerning passing the $9,000 check from Dupree, on which Lemons forged an endorsement. The check was payable to First Equity Financial and drawn on Dupree's account with Texas American Bank. As noted, Lemons endorsed it by typing "First Equity Financial by" and signing "Jerry Lane." First Equity Financial did not then exist; and Jerry Lane, the earlier referenced CEO of Shamrock Savings who prepared the underlying invoice for $9,000 to Dupree, did not authorize his signature. Lemons gave the check to Marvin Sloan as part payment on a vehicle; and Sloan deposited the check into his account at Howe State Bank. Howe then processed the check through its correspondent bank, BancTexas, which sent it to the Federal Reserve; and it was ultimately presented to Dupree's bank for collection. Dupree did not question the endorsement when the check was returned to him.

Lemons contends that there was no evidence of intent to defraud any bank of funds it might pay based on the check, because the evidence showed that both he and Dupree knew that it would be paid by Dupree's bank. Lemons also asserts that the typed endorsement was proper and correct, and the name "Jerry Lane" was surplus and not necessary to negotiate the check.

■ But, the government had to prove only that at least one of the banks was at

risk, not that an actual loss was incurred.[3] The president of Howe State Bank testified that his bank would not have accepted the check had it known the endorsement was forged, because it would have been at risk if Dupree had challenged the endorsement. An officer of Texas American Bank also testified that although Texas American had an endorsement guarantee from BancTexas, if Sloan had presented the check directly to Texas American, it would risk distributing customer funds to an unauthorized party, for which it could incur liability.

Section 1344 proscribed executing, or attempting to execute, a scheme to defraud a federally insured financial institution. As noted, evidence that it suffered a loss is not required for a conviction under § 1344. Although the banks did not suffer harm, because Dupree did not challenge the endorsement, they were at risk. Therefore, Lemons' contentions, that the Lane endorsement was merely surplus and that Dupree was able to pay, are of no consequence in considering whether he engaged in a scheme to defraud by the forgery. We find sufficient evidence that Lemons knowingly engaged in a scheme to do so.

### B.

As noted, Lemons contends that his convictions on several counts are multiplicitous: (1) that the convictions on counts 3–8 (the transfers from Franks to Lemons) are multiplicitous to those on counts 1 and 2 (the initial acts to defraud Vernon); (2) that the convictions on counts 3, 4, and 5 (the three payments on June 30) are only a part of a single event, and if not multiplicitous as to counts 1 and 2, could not be separately charged; and (3) that the convictions for the acts charged in counts 3–8 and 10 (the latter being conspiracy to defraud the United States) constitute a single scheme, precluding separate punishment and conviction on count 10. Before trial, he moved, as required, to dismiss counts 2–8 as multiplicitous; he did not do so for count 10.[4] The motion was denied.

As discussed, § 1344 was modeled after the wire and mail fraud statutes. In addition to the earlier referenced sparse legislative history, see *United States v. Poliak,* 823 F.2d 371, 372 (9th Cir.1987), *cert. denied,* 485 U.S. 1029, 108 S.Ct. 1586, 99 L.Ed.2d 901 (1988) (§ 1344 is "patterned" after mail and wire fraud statutes). Under those statutes, each use of the mail or wire facilities "for the purpose of executing such scheme" is a separate offense. 18 U.S.C. §§ 1341 and 1343; *see, e.g., United States v. Gallardo,* 915 F.2d 149, 151 (5th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 707, 112 L.Ed.2d 696 (1991); *United States v. Blankenship,* 746 F.2d 233, 236 (5th Cir.1984).

---

**3.** In this circuit, a bank need not suffer a financial loss to support a conviction for bank fraud under § 1344. *See United States v. Church,* 888 F.2d 20 (5th Cir.1989); *Briggs,* 939 F.2d at 225–26 ("Is the financial institution the victim in a scheme whose execution causes it no actual or *potential* loss?") (emphasis added). Other circuits are of the same view. *E.g., United States v. Solomonson,* 908 F.2d 358, 364 (8th Cir.1990); *United States v. Walker,* 871 F.2d 1298, 1305 n. 6 (6th Cir.1989); *United States v. Goldblatt,* 813 F.2d 619, 624 (3d Cir.1987).

> The jury was instructed in part as follows: It is not necessary that the Government prove all of the details alleged in the indictment concerning the precise nature and purpose of the scheme or that the alleged scheme actually succeeded in defrauding either of the two banks identified in the indictment.
> What must be proved beyond a reasonable doubt, [is] that the defendant knowingly and willfully devised or intended to devise a scheme to defraud substantially the same ones alleged in the indictment, that the two banks were federally insured, and that the defendant executed the scheme as alleged in the indictment.
> Although it is not necessary for the Government to prove an actual loss of funds by either of the two banks, the Government must prove, beyond a reasonable doubt, that the defendant's scheme and artifice, if any, placed one or both of the banks at a risk of loss and that neither of the two banks knowingly accepted such a risk.

The jury was also instructed on the Texas law of negotiable instruments.

**4.** Failure to object to an indictment on grounds of multiplicity prior to trial constitutes a waiver of that objection. *E.g., United States v. Marroquin,* 885 F.2d 1240, 1245 (5th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1807, 108 L.Ed.2d 938 (1990); *United States v. Gerald,* 624 F.2d 1291, 1300 (5th Cir.1980), *cert. denied,* 450 U.S. 920, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981).

■ "Multiplicity" is charging a single offense in more than one count in an indictment. Accordingly, it "addresses double jeopardy; and where the jury is allowed to return convictions on multiplicitous counts, the remedy is to remand for resentencing, with the government dismissing the count(s) that created the multiplicity." *United States v. Moody,* 923 F.2d 341, 347 (5th Cir.1991). "The chief danger raised by a multiplicitous indictment is the possibility that the defendant will receive more than one sentence for a single offense." *United States v. Swain,* 757 F.2d 1530, 1537 (5th Cir.), *cert. denied,* 474 U.S. 825, 106 S.Ct. 81, 88 L.Ed.2d 66 (1985). "Moreover, '[w]hether a continuous transaction results in the commission of but a single offense or separate offenses ... is determined by whether separate and distinct prohibited acts, made punishable by law, have been committed.'" *Id.* at 1536 (quoting *United States v. Shaid,* 730 F.2d 225, 231 (5th Cir.), *cert. denied,* 469 U.S. 844, 105 S.Ct. 151, 83 L.Ed.2d 89 (1984)); *see also United States v. Guzman,* 781 F.2d 428, 432 (5th Cir.), *cert. denied,* 475 U.S. 1143, 106 S.Ct. 1798, 90 L.Ed.2d 343 (1986).

■ Only a few decisions have discussed multiplicity in the context of § 1344. In *Poliak,* the defendant, charged with ten counts of bank fraud, contended that the indictment was multiplicitous, asserting that it charged a single scheme to defraud in ten separate counts. Poliak set up three separate fictitious businesses and opened three checking accounts at three banks. His check kiting operation involved these three accounts over a two week period. The indictment alleged drawing ten checks, and Poliak contended that § 1344 required that they be merged into a single scheme of bank fraud. Noting that this was an issue of first impression, the Ninth Circuit looked to the language and legislative history of § 1344. On examining § 1344's "whoever knowingly executes" a scheme to defraud language, the court held:

> We believe this language plainly and unambiguously allows *charging each execution of the scheme to defraud as a separate act.* We find no legislative intent to the contrary. Here, Poliak wrote ten separate checks, *each a different and separate execution of the scheme* to defraud the banks.

823 F.2d at 372 (emphasis added).[5]

In *United States v. Schwartz,* 899 F.2d 243 (3d Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 259, 112 L.Ed.2d 217 (1990), Schwartz was charged with depositing checks drawn on accounts with insufficient funds. The first count referred to a $30,000 check; the second and third counts incorporated the first count by reference, but made reference respectively to checks for $35,000 and $85,000. Acquitted on count 1, but convicted on counts 2 and 3, Schwartz contended that he should be subject to only a single sentence on the second and third counts. The court held that "each deposit was a separate violation of 18 U.S.C. § 1344(a)(1), because in making each deposit Schwartz was executing his scheme to defraud [the bank]." *Id.* at 248. The court quoted from *Poliak* that § 1344(a) " 'plainly and unambiguously allows charging each execution of the scheme to defraud as a separate act.' " 899 F.2d at 248 (quoting *Poliak,* 823 F.2d at 372). *See also United States v. Mason,* 902 F.2d 1434, 1437 (9th Cir.1990) ("The plain language of the statute states that each execution of the scheme constitutes a separate offense.").

As noted, Lemons' contention that the convictions on counts 3–8 are multiplicitous to those on counts 1 and 2 is, in essence, a restatement of his challenge to the suffi-

---

5. The court then supported its reading of § 1344 by an examination of the mail and wire fraud statutes "on which the bank fraud statute is patterned"; it noted that, as discussed, "[u]nder the mail fraud statute each mailing *in furtherance of the scheme* constitutes a separate violation." 823 F.2d at 372 (emphasis added). As discussed *infra,* we find a clear difference between the mail and wire fraud statutes on the one hand and the bank fraud statute on the other as to liability *vel non* for acts in furtherance of the scheme. However, on the facts in this case, we do not see ourselves in conflict with *Poliak.* It correctly holds, as quoted above, that § 1344 "allows charging each execution of the scheme to defraud". 823 F.2d at 372. Obviously, the question in each case is what constitutes an "execution of the scheme."

ciency of the evidence for those counts: that there was only one scheme or artifice to defraud Vernon, and that it was complete when Vernon paid Dupree $1 million of the assignment fee and Dupree in turn paid Franks $212,000 for Lemons. However, as discussed above, the receipt of money or other benefit by Lemons from Franks was a part of the scheme to defraud.

This notwithstanding, and as stated, on these facts we find only one execution of the scheme to defraud. The mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343, expressly punish separate acts in execution of a scheme to defraud. For example, the mail fraud statute punishes "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever...." 18 U.S.C. § 1341.

In contrast, the bank fraud statute punishes "[w]hoever knowingly *executes* ... a scheme or artifice to defraud". 18 U.S.C. § 1344(a)(1) (emphasis added). For example, Black's defines "execute" as "[t]o complete; to make; to sign; to perform; to do; to follow out". Black's Law Dictionary 567 (6th ed. 1991). The fact that each act in execution of a scheme is a punishable offense under the mail or wire fraud statutes does not allow reading the bank fraud statute to likewise punish each act in execution of a scheme or artifice to defraud. In short, the mail and wire fraud statutes punish each act in furtherance, or execution, of the scheme; but the bank fraud statute imposes punishment only for each execution of the scheme. Concerning Vernon, there was but one scheme and one execution. The movement of the benefit to Lemons, although in several separate stages or acts, was only part of but one performance, one completion, one execution of that scheme.

■ As stated, although the acts charged in counts 1–8 were in furtherance of the scheme, there was but one execution of the scheme. To hold otherwise, on these facts, renders the reach of § 1344 potentially boundless.[6] Accordingly, we hold that the convictions on counts 3–8 are multiplicitous to those on counts 1 and 2. Therefore, we reverse and vacate the convictions on counts 3–8.[7] It may be that the convictions on counts 1 and 2 are multiplicitous with respect to one another; however, as noted, Lemons does not appeal his convictions on those counts (for which he received concurrent sentences of five years). Lemons' sentences are discussed in part II.C.

## C.

As outlined, Lemons was sentenced to five years imprisonment on each count. The sentences on counts 1, 2, 9, and 10 (first set) were concurrent with each other; those on counts 3, 8, 11, 12, and 13 (second set) were concurrent with each other, but consecutive to the first set; and those on counts 4, 5, 6, and 7 were consecutive to each other and the first two sets, resulting in imprisonment of 30 years. He contends that the sentences on counts 3–8 are multiplicitous with each other and with counts 1 and 2 and 10. In the alternative, he contends that the district court abused its discretion in this pre-Guidelines sentence, by

---

6. We do not hold that the execution of a scheme cannot result in the imposition of multiple liability under § 1344 against an individual. *See United States v. Farmigoni* (defendant bank officer signed and issued a fraudulent letter of credit from his bank, which was used to defraud (obtain loan from) another bank in another state; separate convictions under § 1344 as to each bank held not double jeopardy. "Although both indictments arose out of the same initial scheme, neither requires proof of intent to defraud the other unnamed financial institution." 934 F.2d at 66).

7. Lemons also contends that the convictions on counts 3, 4, and 5 are multiplicitous as to themselves and cannot charge separate crimes. Because we find the convictions on counts 3–8 multiplicitous to counts 1 and 2, this issue is moot. Likewise, his contention that his conviction for conspiracy under 18 U.S.C. § 371 (count 10) merged with his convictions on counts 3–8 is also moot. The sentence on count 10 is discussed in part II.C.

imposing separate sentences on counts 4–7 consecutive to those for counts 1, 3, 8, and 10, with such alleged abuse of discretion to include constitutional violations.

### 1.

Lemons does not appeal the other sentences, including the sentences on the other counts in the second set being consecutive to the other counts in the first set. Because we have reversed and vacated the convictions on counts 3–8, Lemons' multiplicity sentencing contentions are moot. Removing the sentences from the above-described sentencing structure leaves the following: first set—counts 1, 2, 9, and 10; and second set—counts 11–13. The sentences in the first set are to be served concurrent to each other (for a total five years); those in the second set are to be likewise served concurrent to each other (for a total five years) and consecutive to the first set, resulting in imprisonment of 10 years, 20 years less than the 30 originally imposed.

■ For the first set, Lemons did not appeal the convictions on counts 1, 2, or 9. As noted, although he appealed count 10, he did not object, prior to trial, to that count being multiplicitous. However, "[e]ven if a defendant waives his right to assert a multiplicity claim, he may still object to multiple sentences ... [but only] if the sentences are [not] to be served concurrently...." *Marroquin,* 885 F.2d at 1245. Service of count 10 concurrently with non-appealed counts 1, 2, and 9 precludes asserting a multiplicity claim for the sentence on that count.

As for the second set (counts 11–13 remaining), Lemons did not appeal counts 11 and 13, and we have affirmed the conviction on count 12; nor did he appeal the sentence on that count. Accordingly, we do not remand for resentencing.

### 2.

It is not clear whether Lemons' abuse of discretion contention reaches beyond the now vacated consecutive sentences on counts 4–7 to the remaining sentences. Accordingly, we address that contention, de-spite having reversed and vacated the convictions (and sentences) on counts 3–8, and find that it is without merit.

The offenses were committed prior to November 1987; therefore, the Sentencing Guidelines are not applicable. Accordingly, "[t]he matter and extent of sentencing [was] committed to the district court's discretion. Absent an allegation and proof that the court was influenced by impermissible motives or incorrect information, a sentence within the range provided by statute will not be reversed." *United States v. Stovall,* 825 F.2d 817, 826 (5th Cir.1987); *see also United States v. Helms,* 897 F.2d 1293, 1299 (5th Cir.), *cert. denied,* — U.S. ——, 111 S.Ct. 257, 112 L.Ed.2d 215 (1990). For pre-guidelines sentences, "[a]s long as the trial judge stays within statutory bounds and respects procedural safeguards, the sentence may be reversed only for 'arbitrary or capricious abuse of discretion.'" *United States v. Wheeler,* 802 F.2d 778, 783 (5th Cir.1986), *cert. denied,* 480 U.S. 908, 107 S.Ct. 1354, 94 L.Ed.2d 524 (1987) (citation omitted).

Lemons contends that his sentence is so disproportionate to the crime committed that it violates the Eighth Amendment, relying on *Solem v. Helm,* 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). *See, e.g., Harmelin v. Michigan,* — U.S. ——, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991); *Burt v. Puckett,* 933 F.2d 350 (5th Cir.1991). In reviewing an Eighth Amendment challenge, the Court in *Solem* stated that "[r]eviewing courts, of course, should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes, as well as to the discretion that trial courts possess in sentencing convicted criminals." 463 U.S. at 290, 103 S.Ct. at 3009.

■ A proportionality analysis involves an examination of (1) the gravity of the offense and the harshness of the penalty, including "the harm caused or threatened to the victim or society, and the culpability of the offender"; (2) the sentences imposed on other criminals in the same jurisdiction;

and (3) the sentences imposed for commission of the same crime in other jurisdictions. *Id.* at 292, 103 S.Ct. at 3010. In *Solem,* the defendant was convicted of passing a check on a nonexistent account; and under a recidivist statute, he was sentenced to life imprisonment without parole. The punishment was held to violate the Eighth Amendment.

■■■ Lemons' convictions involve extremely serious offenses. For example, Vernon is a federally insured financial institution; Lemons' actions affected not just a particular individual, but the shareholders and depositors of Vernon, and ultimately, United States taxpayers. Furthermore, the sentence is within legislative bounds. Each count carried a possible penalty of five years. Moreover, the district court heard the evidence and observed the defendant.

■■■ In comparing Lemons' total sentence with others, we note that he will be eligible for parole. 18 U.S.C. § 4205(a) (repealed effective Nov. 1, 1987). The availability of parole is a proper consideration in reviewing a sentence. *See Passman v. Blackburn,* 797 F.2d 1335, 1350 (5th Cir. 1986), *cert. denied,* 480 U.S. 948, 107 S.Ct. 1609, 94 L.Ed.2d 794 (1987); *Solem,* 463 U.S. at 300–03, 103 S.Ct. at 3014–17. Although Lemons' sentence was more severe than other Vernon officials, most of those individuals cooperated with the government pursuant to plea agreements. As the district court noted, "the fact that someone has entered into a plea bargain and received a lesser sentence would not enter into the court's assessment.... [After] a jury trial ... the Court has been then made aware of all the facts surrounding the particular offense for which the defendant is convicted." *See United States v. Chase,* 838 F.2d 743, 751 (5th Cir.), *cert. denied,* 486 U.S. 1035, 108 S.Ct. 2022, 100 L.Ed.2d 609 (1988). Moreover, it is well established that "[a] mere disparity of sentences among codefendants does not, alone, constitute abuse of discretion." *United States v. Lindell,* 881 F.2d 1313, 1324 (5th Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 1152, 107 L.Ed.2d 1056 (1990).

Nor do we agree with the contention that the district court based the sentence on its religious or moral convictions. Lemons offered his convictions and church affiliation in his request for leniency; the district court simply responded that Lemons' conduct was in contrast to Lemons' religious convictions. The district court did not state that its "own sense of religious propriety had somehow been betrayed" by Lemons' conduct, as the Fourth Circuit found improper in *United States v. Bakker,* 925 F.2d 728, 741 (4th Cir.1991).

Moreover, the district court also did not abuse its discretion by making an assessment of Lemons' character or refusing to be persuaded by the 170 plus testimonial letters written on Lemons' behalf. Lemons contends also that the district court was improperly influenced by adverse letters. However, our review of the record does not reveal that the district court relied on them. In response to Lemons' repeated references to, and reliance on, his supportive letters, the district court merely stated that it had "received some correspondence from others who definitely have a different opinion of you and what sentence I should set today."

Lemons further contends that prior to being sentenced, he should have been provided with the adverse letters in order to challenge the information contained in them, relying on *United States v. Curran,* 926 F.2d 59 (1st Cir.1991). However, as discussed, our review of the record does not indicate that the district court improperly relied on the adverse correspondence. Moreover, when the district court referenced that correspondence, Lemons did not object, did not request to examine it, and did not request that it be made a part of the record. In addition, he had seen one adverse letter and challenged it at sentencing.

### III.

Accordingly, the convictions on counts 3–8 are REVERSED and VACATED; the

convictions and sentences on the remaining counts (1–2 and 9–13) are AFFIRMED.