UNITED STATES of America, Appellee,

v.

D. Gary BARNHART, Appellant.

No. 92–1194.

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 16, 1992.

Decided Nov. 10, 1992.

Rehearing Denied Dec. 16, 1992.

Stephen G. Mirakian, Kansas City, Mo., argued (James R. Wyrsch and Jacqueline A. Cook, on the brief), for appellant.

Marietta Parker, Asst. U.S. Atty., Kansas City, Mo., argued (Kenneth E. Weinfurt, Asst. U.S. Atty., on the brief), for appellee.

Before JOHN R. GIBSON, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and BEAM, Circuit Judge.

FLOYD R. GIBSON, Senior Circuit Judge.

D. Gary Barnhart ("Barnhart") appeals his conviction on one count of aiding and abetting the execution of a scheme to defraud a federally insured bank in violation of 18 U.S.C. §§ 2 and 1344 (1988). We vacate Barnhart's conviction and remand for further proceedings consistent with this opinion.

## I. FACTS

Barnhart founded the Tomahawk Mortgage Company ("Tomahawk") sometime in the 1960s. In 1972, William Lunday joined the company to serve as executive vice president and manage Tomahawk's daily business and financial operations. Eventually, Lunday was offered an opportunity to acquire an ownership interest in the company; Barnhart retained 47% of the stock, Lunday purchased 46%, and the remaining stock was owned by Barnhart Brothers, a separate entity consisting of Barnhart's father, uncle, and other relatives. Once Lunday began working for the company, Barnhart's role in Tomahawk's operations changed; whereas he had formerly overseen the company's daily operations, Barnhart ceased coming into the company's offices on a regular basis and began "wining and dining," playing golf with, and taking trips with, prospective and current clients.

As part of its business, Tomahawk made loans to individuals wanting to purchase homes. In order to prevent its capital from being tied up in these long-term loans, Tomahawk frequently (but not always) "warehoused" loans by selling them on a secondary market. Tomahawk pledged the note

and deed of trust to a bank in order to obtain interim financing, which was made available to Tomahawk pursuant to a line of credit. The bank returned the note and deed of trust to Tomahawk in exchange for a trust receipt. Once Tomahawk sold the note and deed of trust in the secondary market, Tomahawk was required to pay off the bank loan.

At issue are a series of specific mortgage transactions, three involving the Union Bank and five involving Centerre Bank. The notes were sold to the Federal National Mortgage Association ("Fannie Mae") on the secondary market, and Fannie Mae wired the purchase price directly to Tomahawk's account at Merchant's Bank. Approximately two days later, Tomahawk received a list of loans Fannie Mae had purchased and the purchase price for the loans. At that time, Tomahawk was supposed to repay the bank from which it had made the draw on its line of credit. However, in the beginning and middle of 1987, Tomahawk was experiencing serious problems with its cash flow. This situation not only made operating the company difficult, but also threatened to cause problems with Fannie Mae. In order to help the company survive these difficulties, Lunday instructed one of Tomahawk's accountants, Betty Bosch, that the proceeds received from Fannie Mae be used either to pay various operating expenses or to pay other loans; the proceeds were not used to pay the banks for the money borrowed in conjunction with the mortgage that had been sold.

Lunday pleaded guilty to two counts of bank fraud and agreed to assist the government in its continuing investigation of Tomahawk. Barnhart was indicted on eight counts of executing a scheme to defraud a federally insured bank. The indictment listed eight mortgages for which Tomahawk received money from Fannie Mae but failed to repay the corresponding bank loans and charged Lunday with one count of executing a scheme to defraud in relation to each mortgage. Barnhart pleaded not guilty and proceeded to trial.

Pursuant to his plea agreement, Lunday testified against Barnhart. He testified that the two of them discussed the company's problems in February of 1987 and discussed a variety of measures designed to keep Tomahawk afloat. The two agreed that the company should try to obtain financing by using the company's furniture as collateral, by laying off some employees, and by selling some of its servicing rights. Barnhart also agreed to try to repay some of the money he had borrowed from the company. Lunday further testified that the two of them discussed the scheme of "mismatching" the proceeds from the sales of mortgages on the secondary market. In addition to Lunday's testimony, Tomahawk's accounts payable supervisor, Carol Dombrowski, testified that she "overheard" Barnhart and Lunday discussing "which loans to pay." Barnhart testified on his own behalf and denied having any knowledge of Lunday's actions until Lunday told him on or around October 13, 1987 about the financial mismatching.

The above-described testimony was the only direct evidence bearing on Barnhart's knowledge of the scheme prior to October 13, 1987. There was also evidence that the company's financial problems were due, in part, to Barnhart's substantial draws on the company's funds, and that Barnhart regularly received financial statements indicating that the company was having financial difficulty.

On October 16, 1987, Lunday, Barnhart, and Tomahawk's attorney met with officials from Union Bank and disclosed the mismatching. The testimony is in conflict as to whether this meeting was called by Barnhart or by Union Bank's representatives. On October 21, Barnhart called a similar meeting with Centerre Bank's representatives.

Over Barnhart's objection, the court read the following instruction on "deliberate indifference," telling the jury

> You may find that the defendant acted knowingly if you find beyond a reasonable doubt that the defendant was aware of a high probability that the proceeds from the sale of mortgages to Fannie Mae were being used to pay Tomahawk's operating expenses or being used to re-

pay loans on other mortgages ... and that he deliberately avoided learning the truth. The element of knowledge is satisfied if defendant deliberately closed his eyes to what would otherwise have been obvious to him. You may not find that the defendant acted knowingly, however, if you find that the defendant was simply careless. A showing of negligence, mistake, or carelessness is not sufficient to support a finding of knowledge.

The jury acquitted Barnhart on seven of the eight counts; the guilty verdict was returned on the last count, which involved a mortgage taken out by Callis and Lynette Morrill ("the Morrill loan"). Tomahawk took money on its line of credit for the Morrill loan on October 14 and sold the loan to Fannie Mae on October 16; however, as of December 17, Centerre Bank had not been repaid.

## II. DISCUSSION

### A. Sufficiency of the Evidence

■ Barnhart argues the evidence was insufficient to sustain the jury's verdict that he executed or aided and abetted the scheme with regard to the Morrill loan. In light of the fact that we review this claim by construing all reasonable inferences in favor of the jury's verdict, *United States v. Foote*, 898 F.2d 659, 663 (8th Cir.1990), we disagree with Barnhart. The testimony clearly established that a scheme to defraud existed. Furthermore, Lunday's testimony allowed the jury to believe Barnhart knew and approved of the scheme from its inception, and Dombrowski's testimony allowed the jury to believe Barnhart helped execute the scheme by discussing with Lunday which loans should be paid off. Based on this evidence, viewed in favor of the verdict, "a reasonable fact-finder could have found guilt beyond a reasonable doubt." *Id.*

Barnhart, recognizing the heavy burden he carries in challenging the sufficiency of the evidence, raises two additional arguments that require further attention. First, he contends Dombrowski's testimony about the discussions over "which loans to pay" does not definitely indicate that these discussions involved the scheme to mismatch repayments. Second, he contends Lunday's testimony should not be considered in viewing the sufficiency of the evidence because the jury obviously disbelieved it; had Lunday been believed, the jury would have convicted Barnhart on all the counts in the indictment.

We agree that Dombrowski's testimony is less than clear as to the context of the "overheard" discussions. However, we do not weigh the evidence; the jury does. On appellate review, we must construe all the evidence—including the admittedly vague testimony from Dombrowski—in favor of the government. Her testimony's shortcomings may be of concern to a juror, but are not so great that a reasonable juror could not rely on her statements in finding Barnhart guilty beyond a reasonable doubt.

With regard to Barnhart's second point, we recognize the lure of finding additional legal importance in Barnhart's acquittals. However, we have previously held that "inconsistency between verdicts on separate counts of an indictment does not entitle a defendant to reversal of a conviction on insufficient-evidence grounds." *United States v. Kragness*, 830 F.2d 842, 859 (8th Cir.1987) (citing *United States v. Powell*, 469 U.S. 57, 68–69, 105 S.Ct. 471, 478–79, 83 L.Ed.2d 461 (1984)). Consequently, the jury's decision to acquit Barnhart with regard to the first seven loans does not mean there was insufficient evidence to convict him with regard to the eighth.

### B. Multiplicity in the Indictment

■ Barnhart argues the indictment was multiplicitous; that is, it charged a single offense in multiple counts. *Gerberding v. United States*, 471 F.2d 55, 58 (8th Cir.1973). We disagree. 18 U.S.C. § 1344 (1988), the statute at issue in this case, provides as follows:

Whoever knowingly executes, or attempts to execute, a scheme or artifice—

  (1) to defraud a financial institution; or

  (2) to obtain any of the moneys, funds, credits, assets, securities, or other

property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;

shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

This statute was modeled on the mail and wire fraud statutes, and is to be construed broadly. *United States v. Solomonson,* 908 F.2d 358, 364 (8th Cir.1990). In granting the broad effect the statute is to be accorded, courts have recognized each execution of a scheme to defraud constitutes a separate indictable offense. *United States v. Schwartz,* 899 F.2d 243, 248 (3d Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 259, 112 L.Ed.2d 217 (1990); *United States v. Poliak,* 823 F.2d 371, 372 (9th Cir.1987), *cert. denied,* 485 U.S. 1029, 108 S.Ct. 1586, 99 L.Ed.2d 901 (1988). Thus, the first step in determining the number of offenses is to ascertain the contours of the scheme; once that is done, each execution of that scheme is a separate offense. *United States v. Hammen,* 977 F.2d 379, 382 (7th Cir.1992); *Poliak,* 823 F.2d at 372.

■ We do not read *United States v. Lemons,* 941 F.2d 309 (5th Cir.1991) (per curiam) as reaching a contrary result. In *Lemons,* the Fifth Circuit described the scheme as a plan to obtain a fund of money totalling $212,000. However, the scheme did not contemplate that the money be obtained in one transaction; numerous transactions were involved. *Id.* at 312–13. Because the scheme was designed to fraudulently procure $212,000, the court of appeals held that "[t]he movement of the benefit to Lemons, although in several separate stages or acts, was only part of but one performance, one completion, one execution of that scheme." *Id.* at 318. Similarly, in *United States v. Heath,* 970 F.2d 1397, 1400 (5th Cir.1992), the defendants devised a scheme to fraudulently borrow $13 million dollars from a bank in order to finance a real estate transaction. The scheme was carried out by taking out two loans; one for ten million dollars and the other for three million dollars. However, the court of appeals determined the scheme

was executed only once, although two loans were involved, because the two loans were "integrally related." *Id.* at 1402.

In this case, the scheme involved a plan to not repay the loans with the money that was designated for that purpose. In that sense, the scheme is more similar to the check-kiting scheme described in *Poliak* than it is to a scheme to obtain a certain amount of funds or to obtain financing for a particular transaction, as were the cases in *Lemons* and *Heath.* The scheme was executed each time Lunday instructed that a particular loan not be repaid as required, and each execution is a separate, indictable offense.

### C. The Deliberate Ignorance Instruction

#### 1. *The Merits of the Instruction*

■ The deliberate ignorance (or willful blindness) instruction tendered to the jury was patterned on this circuit's model instruction number 7.04. "In essence, a willful blindness instruction 'allows the jury to impute knowledge to [the defendant] of what should be obvious to him, if it found, beyond a reasonable doubt, a conscious purpose to avoid enlightenment.' " *United States v. Hiland,* 909 F.2d 1114, 1130 (8th Cir.1990) (quoting *United States v. Zimmerman,* 832 F.2d 454, 458 (8th Cir.1987) (per curiam)). However, the instruction should not be given out in all cases because, despite the instruction's cautionary disclaimer, there is a " 'possibility that the jury will be led to employ a negligence standard and convict a defendant on the impermissible ground that he should have known [an illegal act] was taking place.' " *United States v. White,* 794 F.2d 367, 371 (8th Cir.1986) (quoting *United States v. Beckett,* 724 F.2d 855, 856 (9th Cir.1984) (per curiam)). Consequently, if the evidence in the case demonstrates only that the defendant either possessed or lacked actual knowledge of the facts in question— and did not also demonstrate some deliberate efforts on his part to avoid obtaining actual knowledge—a willful blindness instruction should not be given. *Hiland,* 909 F.2d at 1130–31; *United States v. Rivera,*

944 F.2d 1563, 1571 (11th Cir.1991). More succinctly, the instruction should not be given unless there is evidence to

support the inference that the defendant was aware of a high probability of the existence of the fact in question and purposely contrived to avoid learning all of the facts in order to have a defense in the event of a subsequent prosecution.

*Id.* (quoting *United States v. Alvarado,* 838 F.2d 311, 314 (9th Cir.), *cert. denied,* 487 U.S. 1222, 108 S.Ct. 2880, 101 L.Ed.2d 915 (1988) (footnote omitted)).

There is no doubt that there was evidence of either actual knowledge or no knowledge on Barnhart's part. The government insists there was also evidence that Barnhart purposely avoided learning of Lunday's actions. To support this proposition, the government emphasizes Barnhart's receipt of documents reflecting Tomahawk's troubled financial status as well as his actions that, purportedly, were causing the company's difficulties. Viewing these factual matters in the light most favorable to the government, *id.* at 1131, we hold it was improper for the district court to instruct the jury on willful blindness.

■ In order for a defendant's ignorance to be deliberate or willful, the defendant must have been presented with facts that put him on notice that criminal activity is probably afoot, and then the defendant must have failed to investigate those facts, thereby deliberately declining to verify or discover the criminal activity. There is no question that Barnhart failed to investigate, and thus remained ignorant of Lunday's criminal acts. However, the facts made available to Barnhart did not suggest that criminal activity was probably afoot. The mere fact that Tomahawk was experiencing a cash flow problem and still remained in business is not sufficient to suggest that the company's continued operations were probably due to illegal conduct. Many businesses remain in operation despite financial difficulties without violating the law. It also does not matter that Barnhart received copies of financial statements describing Tomahawk's difficulties because

the record reflects that nobody could discover the mismatching of loan proceeds simply by examining the documents Barnhart received. Moreover, the fact that Barnhart may have, in some way, caused the company's financial difficulties did not present him with facts from which he could infer a probability that the company was engaged in criminal activity. Even though Barnhart was ignorant of the facts, he was not *deliberately* ignorant because he was not presented with facts that indicated criminal activity was probably occurring; therefore, the willful blindness instruction should not have been given.

### 2. Harmless Error

■ The conviction is not automatically reversed when a willful blindness instruction is erroneously given; the conviction stands if the error was harmless. *E.g., United States v. Regan,* 940 F.2d 1134, 1136 (8th Cir.1991); *White,* 794 F.2d at 371. The standard used to determine if an error is harmless depends on whether the error affects a constitutional right. *United States v. Drummond,* 903 F.2d 1171, 1174 (8th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 759, 112 L.Ed.2d 779 (1991). The improper use of the willful blindness instruction does affect constitutional rights because it creates a risk that the defendant will be convicted because he acted negligently or recklessly, *White,* 794 F.2d at 371; *see also United States v. de Francisco–Lopez,* 939 F.2d 1405, 1411 (10th Cir.1991); *United States v. Caliendo,* 910 F.2d 429, 435 (7th Cir.1990); *Beckett,* 724 F.2d at 856, thereby relieving the government of its constitutional obligation to prove the defendant's knowledge beyond a reasonable doubt. *E.g., Sandstrom v. Montana,* 442 U.S. 510, 521, 99 S.Ct. 2450, 2458, 61 L.Ed.2d 39 (1979). In determining whether the error was harmless, we endeavor to determine whether, absent the error, it is "clear beyond a reasonable doubt that the jury would have returned a verdict of guilty[.]" *United States v. Hasting,* 461 U.S. 499, 510–11, 103 S.Ct. 1974, 1981, 76 L.Ed.2d 96 (1983); *see also United States v. Johnson,* 968 F.2d 768, 772 (8th Cir.1992) (quoting *Chapman v. California,*

386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967)). In conducting this inquiry, we consider the circumstances of the error and the quality of the evidence in support of the verdict. *White,* 794 F.2d at 371 ("given the overwhelming evidence of [the defendant's] direct participation in the mail theft, we hold the error was harmless.").

■ The government contends the error was harmless because if the jury had truly relied on the willful blindness instruction to impute knowledge to Barnhart, it would have convicted him on all the counts in the indictment; by acquitting Barnhart on all counts except the last, the jury obviously relied on Barnhart's testimony that he had actual knowledge of the scheme prior to the Morrill loan. This is obviously one plausible interpretation of the jury's thought processes. On the other hand, the jury may have found Barnhart guilty of aiding the scheme's execution because though he discovered the existence of the scheme on October 13, he failed to discover (and prevent) Lunday's subsequent execution of the scheme with respect to the Morrill loan. This latter reconstruction is consistent with the fear that a willful blindness instruction may impermissibly diminish the knowledge requirement. *Cf. United States v. Sanchez–Robles,* 927 F.2d 1070, 1075–76 (9th Cir.1991). Additionally, we note the evidence against Barnhart is not especially strong; the evidence of his knowledge came down to a credibility determination between Barnhart and Lunday. We also note that the count of conviction involved the Morrill loan, yet there is no evidence that Barnhart did anything with respect to this particular execution of the scheme.[1] In fact, five days after Tomahawk learned Fannie Mae had purchased the Morrill loan, Barnhart initiated a conversation with Centerre Bank's representatives in which the scheme was revealed. Because of the risks associated with an improperly tendered willful blindness instruction and the relatively weak evidence of Barnhart's guilt, we are not convinced erroneous use of the instruction was harmless beyond a reasonable doubt. Therefore, we vacate the conviction and remand.

---

**1.** We stress that our discussion of the evidence with regard to harmless error does not conflict with our discussion of the evidence in part II.A of our opinion. As we noted in part II.A, we review a claim of insufficiency of the evidence by construing all evidence in favor of the government. However, we do not use this favorable standard of review once we have determined there was an error and we are endeavoring to determine whether that error was harmless. It would be impossible to determine whether an error was harmless beyond a reasonable doubt, as required by *Hasting,* 461 U.S. at 510, 103 S.Ct. at 1981 and *Chapman,* 386 U.S. at 24, 87 S.Ct. at 828, while viewing the evidence in the government's favor. Such a point of view would render all errors harmless unless there was insufficient evidence to sustain the conviction, which is clearly not the appropriate standard.