# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 02-1244

———————

United States of America,
                                        *

              Appellee,                     *

                                          * Appeal from the United States

       v.                                 * District Court for the

                                          * Eastern District of Arkansas.

Clarence W. Woodard,               *

                                          *

             Appellant.                 *

———————

Submitted:  December 10, 2002

Filed: January 14, 2003

———————

Before BOWMAN, MORRIS SHEPPARD ARNOLD, and RILEY, Circuit Judges.

———————

BOWMAN, Circuit Judge.

A jury convicted Clarence W. Woodard and Mark Keller of conspiracy to commit health care fraud, to file false claims, and to use the mails in furtherance of a scheme to defraud finding Woodard and Keller, as principals of Keller Medical Services, Inc. ("KMS"), conspired to submit false claims for Medicare reimbursement for ambulance transportation of dialysis patients.  On appeal, Woodard contends the District Court[1] erred by permitting the government to cross-examine him about

———

[1]The Honorable Susan Webber Wright, United States District Court for the Eastern District of Arkansas.

several irregular business loans involving a related partnership and by giving a deliberate ignorance jury instruction and an erroneous conspiracy jury instruction. For the reasons stated below, we affirm Woodard's conviction.

I.

Woodard and Keller served as co-owners of KMS, which provided ambulance services in and around Jonesboro, Arkansas. Woodard, a certified public account, handled personnel and payroll matters for the company. KMS was a licensed Medicare provider of ambulance services and contracted with Arkansas Blue Cross and Blue Shield, Inc. and with the U.S. Department of Health and Human Services ("HHS"). In 1996, KMS began transporting dialysis patients to and from the regional medical center in Jonesboro and sought reimbursement for these services from Blue Cross, which served as the fiscal intermediary for HHS for the Medicare Part B Program. The Medicare program would compensate KMS if the transportation of the Medicare beneficiary is medically necessary (i.e., if the patient cannot be transported safely by any other means),with medical necessity determined at the time of transport. KMS received a copy of the Medicare Ambulance Handbook, which states that dialysis patients ordinarily do not need ambulance transportation. Medicare paid $280 or more per trip, plus fees for mileage.

According to the government, the claims submitted by KMS for transportation of dialysis patients were false because those claims represented that these trips were medically necessary. An FBI and HHS investigation of the scheme revealed that KMS filed fraudulent claims for fifteen dialysis patients, totaling more than $1.2 million. Of that total, KMS received $1,093,921.81. At trial, the government presented evidence from Dr. Michael Mackey, the director of the regional dialysis clinic in Jonesboro, who testified about five dialysis patients who he believed did not need ambulance transportation to the medical center. Several other witnesses, including paramedics and medical technicians from the area, gave testimony to the

same effect. Jimmy Willis Hart, a former KMS manager, testified that he met with Woodard and Keller in 1997 and told them, after meeting with Bridget Barfoot, a Medicare representative, that thirteen out of the fourteen dialysis patients transported by KMS were not compensable. Woodard and Keller responded that KMS could not afford the loss of revenue, and they discussed several options to continue the service, including depositing the revenues into a separate account in the event Medicare audited the company. Woodard and Keller told Hart to continue transporting the patients.

Gaylon Wade Murray, Hart's successor at KMS and a co-defendant in this case who pled guilty before trial, testified that he transported six dialysis patients who did not need ambulance service and that he had discussed this practice with Woodard and Keller in November 1997. Murray further testified that Barfoot showed him an anonymous note advising Medicare that KMS was transporting dialysis patients. Murray then showed the note to Woodard, who responded that, "I don't think this is anything to worry about." Tr. at 871. In response, Murray ran reports for the dialysis patients to determine how much KMS would be responsible for if the company had to reimburse Medicare. Woodard expressed no interest in the reports. Woodard later cut short a meeting sought by two KMS paramedics in which they discussed their concern about transporting dialysis patients. In his own defense, Woodard testified that he was not involved in managing the day-to-day operations of KMS and he denied any involvement or knowledge of the scheme of filing false Medicare reimbursement claims.

II.

Woodard first argues the District Court erred by allowing the government to cross-examine him about his receipt of certain loan proceeds because "this line of questioning and the exhibit were misleading, confusing, irrelevant and prejudicial." Br. of Appellant at 20. Specifically, Woodard contends that the disbursement of these funds concerned entities that had nothing to do with the conspiracy alleged in the

-3-

indictment. According to the government, Woodard received the loan proceeds through a sophisticated disbursement of checks among three companies, including KMS, owned by Woodard, Keller and George Stem. The funds came from a construction loan from Union Planter's Bank to KMS.

At trial, the government presented evidence that the loan funds were first moved from KMS to Stem's construction company. After that, the funds were moved from this company to KWV, a partnership between Woodard, Keller and Stem. Finally, the funds were transferred from KWV to the individual partners, each of whom received $73,000. Keller testified during his cross-examination that he did not know why Stem's construction company transferred several hundred thousand dollars to KWV and that Woodard was in a better position to answer that question. Keller also admitted that he and Woodard each received $73,000 from KWV. Woodard later testified in his own defense and during his cross-examination objected to questions relating to these funds. The District Court overruled Woodard's objections and ruled the evidence went to the financial condition of KMS and was important to help the jury determine Woodard's credibility.

We review the District Court's ruling for abuse of discretion. See United States v. NB, 59 F.3d 771, 778 (8th Cir. 1995) (standard of appellate review for a district court's ruling on the proper scope of cross-examination). A district court has "broad discretion in determining the relevancy and admissibility of evidence . . . and in setting the limits of cross-examination." United States v. Wallace, 722 F.2d 415, 416 (8th Cir. 1983) (citations omitted). We give great deference to the trial judge who heard the evidence and determined whether the probative value of the evidence was sufficient to outweigh the danger of unfair prejudice. Id. The prejudicial impact of the evidence must be strong enough to deny the defendant a fair trial. See id. at 417. Unfair prejudice occurs where the evidence has an "undue tendency to suggest [a] decision on an improper basis, commonly, though not necessarily, an emotional one." United States v. Emeron Taken Alive, 262 F.3d 711, 714 (8th Cir. 2001) (quoting

Fed. R. Evid. 403, Adv. Comm. Notes). In addition, "[i]f a defendant takes the stand, his credibility is placed in issue, and the Government is entitled to attack it by cross-examination." Wallace, 722 F.2d at 416 (citation omitted); see also Fed. R. Evid. 611(b) ("scope of cross-examination").

Based on our review of the record, we conclude the District Court did not abuse its discretion in permitting the government to cross-examine Woodard about these construction loan proceeds. At a minimum, Woodard placed his credibility in issue by testifying about the loan during direct examination. See Wallace, 722 F.2d at 417 ("Cross-examination may embrace any matter germane to direct examination, qualifying or destroying it, or tending to elucidate, modify, explain, contradict, or rebut testimony given by the witness." (quoting Roberts v. Hollocher, 664 F.2d 200, 203 (8th Cir. 1981)). Moreover, we agree with the District Court that the testimony is relevant because it "goes not only to the financial condition of [KMS], but also it is important . . . to help the jury determine the credibility of these defendants." Tr. at 1769.

Woodard next argues that the District Court erred in giving a deliberate-ignorance jury instruction. At trial, Woodard objected to the instruction, arguing that it would permit the jury to convict him without finding the requisite mental state for the conspiracy count. The court instructed the jury as follows:

> You may find that a defendant acted knowingly if you find beyond a reasonable doubt that a defendant was aware of a high probability that Medicare was falsely billed for transportation of dialysis patients and that he or she deliberately avoided learning the truth. The element of knowledge may be inferred if a defendant deliberately closed his or her eyes to what would otherwise have been obvious to him or her.
>
> You may not find that a defendant acted knowingly, however, if you find that a defendant actually believed that Medicare was not falsely

billed for transportation of dialysis patients. A showing of negligence, mistake, or carelessness is not sufficient to support a finding of knowledge.

Tr. at 1865.

We review the District Court's decision to give a jury instruction under the abuse-of-discretion standard. United States v. Willis, 277 F.3d 1026, 1031 (8th Cir. 2002). Our review of the District Court's decision to give this particular instruction must be done by viewing the evidence and any reasonable inference from that evidence in the light most favorable to the government. See United States v. Bussey, 942 F.2d 1241, 1246 (8th Cir. 1991), cert. denied, 504 U.S. 908 (1992). While a district court should not give the deliberate-ignorance instruction when the evidence points *solely* to the defendant's actual knowledge of the facts in question, the "instruction is particularly appropriate when the defendant denies any knowledge of a criminal scheme despite strong evidence to the contrary." United States v. Regan, 940 F.2d 1134, 1136 (8th Cir. 1991) (citation omitted). "In order for a defendant's ignorance to be deliberate or willful, the defendant must have been presented with facts that put him on notice that criminal activity is probably afoot, and then the defendant must have failed to investigate those facts . . . . " United States v. Barnhart, 979 F.2d 647, 652 (8th Cir. 1992).

In this case, the government presented more than sufficient evidence to support the District Court's decision to give the deliberate-ignorance instruction. At trial, Woodard repeatedly denied any knowledge or involvement in the scheme of filing false Medicare claims for ambulance transportation of dialysis patients. Testimony from KMS personnel and others showed that Woodard remained deliberately ignorant of this scheme. In light of the record before us, we have no doubt that the jury could reasonably conclude that Woodard was aware that criminal activity was

probably "afoot" at KMS and that he deliberately closed his eyes to it. The District Court did not abuse its discretion in giving this instruction.

Finally, Woodard argues the District Court erred in giving an erroneous instruction on conspiracy. Woodard contends that we should reverse his conviction because the District Court committed plain error by omitting the phrase "for the purpose of carrying out or carrying forward the agreement or understanding" from its conspiracy charge. The Eighth Circuit Model Jury Instructions sets out the pertinent portion of the conspiracy instruction: "while the agreement or understanding was in effect, a person or persons who had joined the agreement knowingly did one or more of the following acts: (list overt acts for which there is sufficient evidence) *for the purpose of carrying out or carrying forward the agreement or understanding*." Eighth Circuit Manual of Model Jury Instruction (Criminal) § 5.06A (2000) (emphasis added). According to Woodard, the omission of the language from the model instruction in the District Court's conspiracy charge could have allowed the jury to convict him of something less than conspiracy because "the jury could have found that one of the overt acts occurred but may not have found that the act was knowingly done in furtherance of the conspiracy." Br. of Appellant at 26. Woodard, however, failed to object to this instruction at trial.

Because Woodard failed to object to this instruction at trial, he waived this objection on appeal. See United States v. Watson, 953 F.2d 406, 409 (8th Cir. 1992). Accordingly, our review is only for plain error. Id. Under this standard of review, we will reverse Woodard's conviction only if the error in the instruction prejudices his substantial rights resulting in a miscarriage of justice. See United States v. Yellow Hawk, 276 F.3d 953, 955 (8th Cir. 2002); see also United States v. Beck, 250 F.3d 1163, 1166 (8th Cir. 2001) ("Plain error review is extremely narrow and is limited to those errors which are so obvious or otherwise flawed as to seriously undermine the fairness, integrity, or public reputation of judicial proceedings."). Our evaluation of the conspiracy instruction in this case must be made in the context of

the entire jury charge. See United States v. Pinque, 234 F.3d 374, 377 (8th Cir. 2000), cert. denied, 532 U.S. 1044 (2001); see also Crimm v. Missouri Pac. R.R. Co., 750 F.2d 703, 711 (8th Cir. 1984) ("Where the instructions, considered as a whole, adequately and sufficiently state the generally applicable law, the fact that the instructions are technically imperfect or are not a model of clarity does not render the charge erroneous.") (citation and internal quotation omitted).

Here, it is undisputed that the District Court omitted a portion of one of the elements of the conspiracy offense in its instructions. Nonetheless, we conclude, when viewing the jury charge and the record as a whole, that the jury was adequately informed of the necessity of finding Woodard committed one or more of the overt acts in furtherance of the conspiracy to defraud Medicare for transportation of dialysis patients. The indictment, which was read to the jury and then given to the jury during its deliberations, charges Woodard with conspiracy to commit certain offenses against the United States and then lists those offenses. See Tr. at 1845. The evidence presented on the conspiracy count was substantial. The Supreme Court has held that where the government sets forth essentially uncontroverted evidence that overwhelmingly supports a conviction, the conviction should stand unless the defendant makes a plausible argument that the instructional error "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." Johnson v. United States, 520 U.S. 461, 470 (1997) (alteration in original) (holding that court's failure to submit an element of the offense to the jury was insufficient to meet last prong of plain error standard where the evidence of the missing element was "overwhelming"); see also United States v. Gantos, 817 F.2d 41, 43 (8th Cir.) ("When a defendant sits idly by while an alleged element of the offense is omitted, we are not prone to reverse . . . To do so would encourage sharp practices. A defendant could choose not to raise errors in instruction on points where the evidence is overwhelming in order to ensure a new trial on appeal."), cert. denied, 484 U.S. 860 (1987). We find no plain error here.

III.

For the reasons stated, we affirm the judgment of the District Court.

A true copy.

   Attest:

      CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.