# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-1112

_____

United States of America,                 *
                                          *
              Appellee,                    *
                                          *  Appeal from the United States
       v.                                  *  District Court for the Western
                                          *  District of Missouri.
Robert Richard King,                       *
                                          *
              Appellant.                    *

_____

Submitted: September 8, 2003

Filed: December 15, 2003

_____

Before MORRIS SHEPPARD ARNOLD, BEAM, BYE, Circuit Judges.

_____

BEAM, Circuit Judge.

On June 27, 2001, a grand jury indicted Richard King for conspiring to violate the Foreign Corrupt Practices Act ("FCPA") and for violating the FCPA and the Interstate Travel in Aid of Racketeering Act ("Travel Act") by agreeing to bribe Costa Rican officials to obtain valuable land concessions needed to develop a Costa Rica project. A jury later convicted King of one count of conspiracy and four counts under

the FCPA. The district court[1] sentenced King to thirty months' imprisonment and fined him $60,000.

King appeals claiming: 1) the evidence was insufficient to support the convictions, 2) the trial court erred by admitting some tape recordings while denying the recordings King offered, 3) the trial court erred by instructing the jury on "deliberate ignorance," and 4) the trial court erred by denying King's motion to dismiss the indictment prior to trial due to the government's overreaching conduct. For the reasons set forth below, we affirm.

## I.    BACKGROUND

This case involves an FBI investigation into the dealings between certain individuals who hoped to develop a port in Limon, Costa Rica. The focus of the investigation concerned the planned payment of a $1 million bribe (a.k.a. "kiss payment" or "closing cost" or "toll") to senior Costa Rican officials and political parties to obtain concessions for the land on which the new development was to be built.

Much of the investigation centered around the dealings of Owl Securities and Investments, Ltd. ("OSI"), a company based in Kansas City, and its employees and contributors. Several individuals attempted to raise funds from investors through OSI for the multi-faceted project in Costa Rica involving a large land and port development. The project had many components including a port, a salvage station, development of recreational facilities, housing, light manufacturing, warehouses, and an airport. During the investigation, the FBI encountered several individuals including Stephen Kingsley, President and CEO of OSI; Richard Halford, OSI's CFO;

---

[1] The Honorable Scott O. Wright, United States District Judge for the Western District of Missouri.

Albert Reitz, OSI's VP; Pablo Barquero, an agent of OSI in the Costa Rican office; and Defendant King, one of OSI's largest investors. FBI Special Agent Robert Herndon led the inquiry, originally investigating Kingsley and OSI. Ultimately, Agent Herndon sought the cooperation of both Kingsley and Reitz to obtain recordings of conversations between alleged conspirators, including King.

## II. DISCUSSION

### A. Sufficiency of the Evidence

"In reviewing the sufficiency of the evidence on appeal, the court views the evidence in the light most favorable to the government, resolving evidentiary conflicts in favor of the government, and accepting all reasonable inferences drawn from the evidence that support the jury's verdict." United States v. Two Eagle, 318 F.3d 785, 790 (8th Cir. 2003). We are bound by a strict standard of review when reviewing the sufficiency of the evidence, and the verdict of the jury should not be overturned lightly. Id. "The verdict must be upheld 'if there is substantial evidence that would allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt.'" United States v. Waldman, 310 F.3d 1074, 1077 (8th Cir. 2002) (quoting United States v. Wright, 246 F.3d 1123, 1126 (8th Cir. 2001)).

At trial, the government presented six witnesses. Two of those witnesses, Richard Halford and Albert Reitz, testified on behalf of the government pursuant to a plea agreement wherein each pleaded guilty to certain offenses in exchange for the possibility of a more lenient sentence. The government questioned each of the six witnesses about King's involvement with and knowledge of the planned bribe. The government also published portions of several taped conversations between King and others, which Stephen Kingsley recorded at the FBI's request. These taped conversations involving King occurred between May 26, 2000, and August 17, 2000.

To prove conspiracy, the government must show an agreement between at least two people and that the agreement's objective was a violation of the law. United States v. Jackson, 345 F.3d 638, 648 (8th Cir. 2003). "Proof of a formal agreement is unnecessary; a tacit understanding is sufficient, and can be proved by direct or circumstantial evidence." Id. (citation omitted).

For King's remaining FCPA convictions, the plain language of the FCPA prohibits the use of "any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value to any foreign official for purposes of influencing any act or decision of such foreign official in his official capacity." 15 U.S.C. § 78dd-1(a)(1)(A).

Viewing the evidence in the light most favorable to the verdict, there was ample evidence in the record to support the jury's convictions. The tape recordings, alone, support the jury's verdict.[2] There was sufficient evidence to prove King's

---

[2]For example, the following exchanges are just a small sample of what the jury heard:

May 26, 2000:

| Kingsley: | Well you've always known about the closing cost fees and that. |
| King: | I've known what? |
| Kingsley: | You've known about the closing costs. |
| King: | The one million dollars? |
| Kingsley: | Yeah. |
| King: | I've known about that for five years, yeah, . . . |

June 1 and 2, 2000:

King: You see when they walk into the bank, you know, the bank is going to be curious as to what they're putting up a million-dollars for . . .

Kingsley: Well do they . . .

King: . . . If they do a letter of credit.

Kingsley: . . . do the bank . . . do . . .

King: Ah, my own bank does not ask for that. My own bank is going to take the Falcon. But if I go with these other people, a letter of credit, and the reason I may go to them for a letter of credit instead of my own letter of credit is that it's, it's going to get them involved in this.

Kingsley: Yeah. Do

King: And we don't, we don't want just a million-dollars, we want a hundred thirty-five million.

Kingsley: Yeah. Do they know what the million[']s for though?

King: Ah, probably . . . I think I told them yeah.

Kingsley: Yeah. Well

King: They didn't bat an eye.

Kingsley: (coughs)

King: I put it in this letter as a closing cost.

Kingsley: Yeah, that's what Dick likes to call it, is a closing cost.

June 28, 2000:

Kingsley: Well, look, what.

Halford: He irritated a lot of people.

Kingsley: Yeah, what, um, what Pablo had said, was why just pay, pay off the current politicians. Pay off the future ones.

King: That's right. Because we're gonna have to work with them anyway.

Kingsley: And so what he was saying was double, you know, give them more money. Buy the opposition. If you buy the current party and the opposition, then it doesn't matter who's in because there's only two parties.

| | |
|---|---|
| King: | The thing that really worries me is that, uh, if the Justice Department gets a hold of. Finds out how many people we've been paying off down there. Uh, or even if they don't. Are we gonna have to spend the rest of our lives paying off these petty politicians to keep them out of our hair? I can just see us, every, every day some politician on our doorstep down there wanting a hand out for this or that. |
| Kingsley: | Well, I mean, |
| King: | I'd like to |
| Kingsley: | I |
| King: | Think we could pay the top people enough, that the rest of the people won't bother us any. That's what I'm hoping this million and a half dollars does. I'm hoping it pays enough top people . . . |

August 17, 2000:

| | |
|---|---|
| Kingsley: | Now Pablo's continued to talk to the politicians. They know about the toll, closing costs call it what you will. So he's still our biggest asset in place. |
| King: | What do they know about the closing costs? |
| Kingsley: | Who? |
| King: | Does everybody agree to what we talked about recently? |
| Kingsley: | Yeah, a million into escrow for the toll. |
| King: | And then we get the property and then we do the (unintelligible)? |
| Kingsley: | Um hum. Yeah now let me I'll, I'll, I'll come on to that because I'll explain how we work through that. Uh, essentially once the politicians see the money in escrow, they'll move. That's what it comes down to (clears throat). Pablo's gonna send a list, an e-mail with a list of politicians already paid off and the ones he's gonna pay off. |
| King: | Isn't that awfully dangerous? |
| Kingsley: | No e-mail's probably the most secure form of communication. |
| King: | From what I read it's not, number one and number two, |

knowledge of the proposed payment long before Kingsley became an informant for the government. Moreover, the recordings show King's knowing participation in, approval of, and subsequent actions in furtherance of the conspiracy to offer the bribe. In addition, the testimony of six witnesses conducted over a five-day period, and the remaining exhibits support the jury's conviction of King for conspiracy and substantive violations under the FCPA.

## B. Evidentiary Rulings

King also challenges the district court's admission of the FBI tapes, arguing that 1) without Kingsley or Barquero available for cross-examination[3] the admission of their statements violated King's Sixth Amendment right to confrontation, 2) the district court's admission of only portions of the tapes violated the rule of completeness, and 3) there were reasons to question the accuracy and completeness of the tapes.

We review the district court's evidentiary rulings for abuse of discretion. Asa-Brandt, Inc. v. ADM Investor Servs., Inc., 344 F.3d 738, 747 (8th Cir. 2003). First,

---

there's got to be a better way.

| | |
|---|---|
| Barquero: | We have to make the politicians sure that they are going to get that. That is one thing that we have to make them feel comfortable that uh, we would get the full support. |
| King: | I (unintelligible) |
| Barquero: | What |
| King: | I'm more concerned about |
| Barquero: | (unintelligible) |
| King: | Not getting caught. |

[3]Kingsley was found dead on October 14, 2000, and Barquero, who was charged in this case, remains a fugitive.

the admission of the Kingsley conversations are non-hearsay, out-of-court statements that raise no Confrontation Clause issues because they were admissible to ensure the completeness and intelligibility of King's admissions. United States v. Stelten, 867 F.2d 453, 454 (8th Cir. 1989). Further, even if some of Kingsley's incriminating statements were offered for the truth, King adopted those statements, thus Federal Rule of Evidence 801(d)(2)(B) deems them to be non-hearsay. Id. Insofar as such hearsay considerations do apply in this case, the exclusionary principles embodied in the Confrontation Clause do not nullify the well-established reasons for making such admissions non-hearsay under the hearsay rule. Id.

Further, the district court did not abuse its discretion in admitting these statements under Rule 801(d)(2)(E) as statements of co-conspirators. King argues that the taped conversations between Kingsley and Barquero did not contain sufficient "indicia of reliability" to pass constitutional muster, were not corroborated by independent evidence, and did not constitute adoptive admissions by King.

Since Bourjaily v. United States, 483 U.S. 171, 182-83 (1987), this Circuit has rejected the indicia of reliability requirement. United States v. Beckman, 222 F.3d 512, 522-23 n.7 (8th Cir. 2000) (holding that Bourjaily rejected the proposition that admission of a co-conspirator statement required sufficient indica of reliability); United States v. Roach, 164 F.3d 403, 409 n. 5 (8th Cir. 1998) ("[T]he Supreme Court has explicitly rejected the need for a separate reliability inquiry.").

> Because hearsay rules and the Confrontation Clause are generally designed to protect similar values, and stem from the same roots, . . . no independent inquiry into reliability is required when the evidence falls within a firmly rooted hearsay exception. We think that the co-conspirator exception to the hearsay rule is firmly enough rooted in our

jurisprudence that . . . a court need not independently inquire into the reliability of such statements.

Bourjaily, 483 U.S. at 182-83 (internal quotations and citations omitted).

To admit statements of co-conspirators under Federal Rule of Evidence 801(d)(2)(E), the government must demonstrate by a preponderance of the evidence "'(1) that a conspiracy existed; (2) that the defendant and the declarant were members of the conspiracy; and (3) that the declaration was made during the course and in furtherance of the conspiracy.'" Beckman, 222 F.3d at 522 (quoting United States v. Bell, 573 F.2d 1040, 1043 (8th Cir. 1978)). Our review of the record demonstrates that the government met this burden in admitting the Kingsley/Barquero statements as those of co-conspirators. Furthermore, the fact that Kingsley allied himself with the government "has no effect on the continuing conspiratorial efforts of his former associates who remain at large," and does not bar admission of his statements under Rule 801(d)(2)(E). United States v. Lewis, 759 F.2d 1316, 1348 (8th Cir. 1985). Barquero's statements made to Kingsley are admissible under Rule 801(d)(2)(E) even though Kingsley was acting under the direction and surveillance of government agents to obtain evidence against the co-conspirators. Id. The district court did not abuse its discretion in admitting these statements. We find King's remaining contentions without merit.

Finally, King challenges the district court's denial under the rule of completeness. Rule 106 provides:

When a . . . recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

Fed. R. Evid. 106.  While in some cases Rule 106 may require that all or portions of a series of recorded conversations be played to avoid misleading the jury, "the party urging admission of an excluded conversation must 'specify the portion of the testimony that is relevant to the issue at trial and that qualifies or explains portions already admitted.'" United States v. Webber, 255 F.3d 523, 526 (8th Cir. 2001) (quoting United States v. Sweiss, 814 F.2d 1208, 1212 (7th Cir. 1987)).  "In addition, the district court has broad discretion to conduct the trial in an orderly and efficient manner, and to choose among reasonable evidentiary alternatives to satisfy the rule of completeness reflected in Rule 106."  Webber, 255 F.3d at 526.

After review of the trial record, we conclude the district court did not abuse its discretion by denying King's request to publish all the tapes to the jury in their entirety.  Nor do we find that the tapes that were submitted to the jury denied King a fair trial.  King *did* present some additional portions of the remaining tapes or tape transcripts to the jury, thus providing context where the defense felt necessary.[4]  As to the remaining portions of the tapes, King does not specify the portion of the testimony that is relevant to the issue at trial and that qualifies or explains the portions already admitted.  See id.  Nor does King show that the tapes that the government introduced at trial misled the jury or provided an incomplete or distorted view of the relationship and communications between King and Kingsley, all of which would be relevant under the Rule 106 inquiry.

Likewise, as to the accuracy and completeness of the tapes, although Kingsley failed to record each and every conversation, Agent Herndon testified that Kingsley would take notes of those conversations and give those notes to the FBI.  Further, the fact that Kingsley recorded the tapes outside the presence of the FBI on many

_____

[4]Even then, King failed to timely request that these supplemental portions be played or read at the time the government first published them to the jury as required under Rule 106, an issue we will not address dispositively in this appeal.

-10-

occasions is also of no consequence. The FBI closely monitored the development of the conversations over time, ensuring the accuracy and consistency as one conversation built upon another. Admitting portions of the tapes in light of this evidence was not an abuse of discretion.

## C.    Deliberate Ignorance Instruction

King also challenges the deliberate ignorance instruction given to the jury. We review the district court's decision to give a jury instruction under the abuse of discretion standard. United States v. Woodard, 315 F.3d 1000, 1003 (8th Cir. 2003). A deliberate ignorance instruction essentially "'allows the jury to impute knowledge to [the defendant] of what should be obvious to him, if it [finds], beyond a reasonable doubt, a conscious purpose to avoid enlightenment.'" United States v. Barnhart, 979 F.2d 647, 651 (8th Cir. 1992) (first alteration in original) (quoting United States v. Zimmerman, 832 F.2d 454, 458 (8th Cir. 1987) (per curiam)). We are cognizant of the risk, however, that a deliberate ignorance instruction might lead the jury to employ a negligence standard and convict a defendant on the impermissible ground that he should have known an illegal act was taking place. Barnhart, 979 F.2d at 651. Thus,

> [o]ur review of the District Court's decision to give this particular instruction must be done by viewing the evidence and any reasonable inference from that evidence in the light most favorable to the government. While a district court should not give the deliberate-ignorance instruction when the evidence points *solely* to the defendant's actual knowledge of the facts in question, the "instruction is particularly appropriate when the defendant denies any knowledge of a criminal scheme despite strong evidence to the contrary."

Woodard, 315 F.3d at 1003-04 (quoting United States v. Regan, 940 F.2d 1134, 1136 (8th Cir. 1991)) (internal citations omitted). "In order for a defendant's ignorance to

be deliberate or willful, the defendant must have been presented with facts that put him on notice that criminal activity is probably afoot, and then the defendant must have failed to investigate those facts . . . ."  Barnhart, 979 F.2d at 652.

The district court did not abuse its discretion by giving the deliberate ignorance instruction.  The only "error" we find, if any, is that the deliberate ignorance instruction was superfluous in this case, which is certainly not reversible error. Given the evidence presented by the government against King, this instruction was irrelevant at worst.  Although the evidence certainly suggested that King was not *ignorant* of the criminal scheme, but rather he, in fact, *knew* of the scheme and worked to perpetuate the bribe, King's defense was to attack the credibility of his co-conspirators and point to the lack of proof of his bad intent, arguing that he did not "corruptly" do anything.  Given this defense strategy, in light of the evidence presented by the government against King, the instruction was appropriate. See id., at 651.

### D.      Motion to Dismiss

King's final argument is that the district court erred in refusing to dismiss the indictment due to the government's alleged outrageous misconduct. King claims that the government allowed its informant Kingsley to target King for prosecution and essentially manufactured the crimes for which King was convicted. The district court, through its adoption of the magistrate judge's[5] report and recommendation, denied King's motion to dismiss.

The court reviews de novo a district court's order denying a motion to dismiss an indictment.  Two Eagle, 318 F.3d at 793.  While there may be circumstances in

---

[5]The Honorable John T. Maughmer, Chief United States Magistrate Judge, United States District Court for the Western District of Missouri.

which the conduct of law enforcement agents is so outrageous that due process bars the government from invoking the judicial process to obtain a conviction, United States v. Russell, 411 U.S. 423, 431-32 (1973), "[t]he level of outrageousness needed to prove a due process violation is quite high, and the government's conduct must shock the conscience of the court." United States v. Pardue, 983 F.2d 843, 847 (8th Cir. 1993) (internal quotations omitted). This defense is reserved for conduct that falls "within that narrow band of 'the most intolerable government conduct.'" Pardue, 983 F.2d at 847 (quoting United States v. Musslyn, 865 F.2d 945, 947 (8th Cir. 1989)).

After our thorough review of the evidence presented at the hearing on the motion to dismiss, we too follow the well-reasoned analysis of the magistrate judge. We find no evidence of conscience-shocking behavior on the part of the government. That the evidence was "contrived" or that trickery was involved is simply not supported by the evidence. We do not dispute that it was quite likely that Kingsley's character was flawed, but we recognize, like the magistrate judge did, that the use of unsavory informants is quite often the nature of the beast in police investigations. Such realities do not rise to the level of outrageousness needed to support a due process violation. Accordingly, we affirm the district court's dismissal of King's motion to dismiss.

## III. CONCLUSION

For the reasons set forth herein, we affirm the judgment of the district court.

_____

-13-