# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-1384
_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Patient Transfer Service, Inc., | * |
| | * |
| Appellant. | * |

_____

Nos. 04-1372/1421
_____

Appeals from the United States
District Court for the
Eastern District of Arkansas.

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellant/Cross-Appellee, | * |
| | * |
| v. | * |
| | * |
| Shirley Wallace, | * |
| | * |
| Appellee/Cross-Appellant. | * |

_____

Nos. 04-1373/1381
_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellant/Cross-Appellee, | * |
| | * |
| v. | * |
| | * |
| Kevin Wise, | * |
| | * |
| Appellee/Cross-Appellant. | * |

_____

Submitted: January 10, 2005
Filed: July 5, 2005
_____

Before LOKEN, Chief Judge, MORRIS SHEPPARD ARNOLD and MURPHY, Circuit Judges.

_____

MURPHY, Circuit Judge.

Patient Transfer Service, Inc. (PTS) and two of its employees were convicted by a jury for filing false Medicare and Medicaid claims. The district court sentenced PTS to a large fine, Kevin Wise to 30 months and a $6,000 fine, and Shirley Wallace to 100 hours of community service. PTS appeals its conviction and sentence. The government appeals the sentences of the employees, and on their cross appeals they appeal their convictions and sentences. We affirm in part and reverse in part.

-2-

I.

PTS is an Arkansas company owned by Donald Wise that provides ambulance transport services. Donald Wise's brother, Kevin Wise, is a licensed paramedic who worked as the general manager of PTS. In that capacity Kevin Wise was in charge of all personnel and oversaw billing procedures. Shirley Wallace is the cousin of these two brothers, and she was the office manager and supervised the billing clerks who filed claims with Medicare and Medicaid.

From January 1997 to March 1999, PTS filed 2,568 Medicare or Medicaid claims with identical coding. All of the claims related to the transportation of twelve individuals with end stage renal disorder. PTS transported them by ambulance from home to a dialysis treatment center and back. In advance of each transport Wallace prepared a transfer form which stated that the patient was confined to bed and could only be moved by stretcher to and from the hospital. The transfer form was given to the paramedics operating the ambulance, who would fill in information particular to the transport, such as the date, time, and crew names. After the patients were transported, the transfer forms would be routed to billing clerks to prepare claim forms for Medicare and Medicaid.

The claim forms contain billing codes the ambulance provider had to fill out to describe the transport: Hospital Admit (yes or no); Type of Transport (initial trip, return trip, transfer trip, or round trip); Bed Confined - Before (yes or no); Bed Confined - After (yes or no); Moved by Stretcher (yes or no); Unconscious / Shock (yes or no); Emergency Situation (yes or no); Physical Restraints (yes or no); Visible Hemorrhaging (yes or no); Transported To / For (nearest facility, preferred physician, nearness of family members, or care of a specialist or availability of specialized equipment); and Medically Necessary (yes or no). In each of the claims at issue, the billing clerk at PTS marked "Y" for "yes" for the codes Bed Confined - Before, Bed

Confined - After, Moved by Stretcher, and Medically Necessary. PTS was reimbursed $841,276 on the basis of these 2,568 claims.

The government investigated PTS and uncovered evidence that these patients had not been confined to bed, had not been moved by stretcher, and had not needed to be transported by ambulance. Medical personnel from the treatment centers testified that each of these twelve patients could have been transported to and from the centers by other means without endangering their health. The FBI videotaped several of the patients walking to or out of the ambulance and their home or treatment center without assistance. Paramedics testified that instead of being transported by stretchers, some of the twelve rode in the front seat of the ambulance or in the captain's chair (an individual seat behind the driver). One of the patients testified that statements on the claim forms indicating that she was confined to bed and needed a stretcher and ambulance transport were false. The husband of another patient gave similar testimony. There was additional evidence that the patients' activities were inconsistent with the descriptions on the claim forms. Some of them drove, cleaned house, gardened, bowled, and engaged in other active pursuits.

The investigation also yielded evidence that the defendants knew that these twelve patients did not fit the descriptions on the claims. Both Kevin Wise and Wallace met a few of the patients in the PTS office, and Wise made some of the transports himself. Transfer forms were occasionally returned with notes from the paramedics indicating that family or friends picked up the patients from the treatment center, and some of the paramedics questioned Kevin Wise about the necessity of ambulance transport for patients who walked without assistance. Wise distributed a memo directing the paramedics to have all dialysis patients ride on stretchers and to take them into the treatment centers on stretchers. He also told paramedics and other employees that PTS had letters of medical necessity on file for the dialysis patients, but an FBI search uncovered no such letters relating to these twelve patients. One item discovered in the search was a note written by Wallace indicating that the

nephrologist treating Phyllis Warren, one of the patients, had advised that she did not need ambulance transport.

The government also investigated two instances in which PTS "double hauled" by transporting two patients together in one ambulance and billing both accounts for the mileage. Neither were on stretchers; one patient rode in the front seat, and the other in the captain's chair. When the billing clerk at PTS noticed the coincidence of dates and times on the transfer forms, she asked Wallace and Kevin Wise how to prepare the claim forms because she did not believe the mileage could be reimbursed twice. She was nevertheless instructed to submit individual claims for each patient. The claim forms did not indicate that more than one patient had been transported, and each form claimed the full mileage for the trip.

PTS, Wallace, Kevin Wise, and Donald Wise were all charged with and acquitted of a conspiracy count that encompassed all 2,568 claims. The jury convicted PTS of twenty two counts of aiding and abetting false or fraudulent claims involving Medicare, in violation of 18 U.S.C. §§ 2 and 287, and two counts of false statements involving Medicaid, in violation of 42 U.S.C. § 1320a-7b. Kevin Wise was convicted of four counts of aiding and abetting false or fraudulent claims involving Medicare in connection with double hauling. Wallace was convicted of one count of aiding and abetting false or fraudulent claims involving Medicare in connection with the transport of Phyllis Warren. The court fined PTS $1,177,786, sentenced Wise to 30 months of imprisonment and a $6,000 fine, and Wallace to 100 hours of community service in lieu of a fine.

## II.

PTS, Wallace, and Kevin Wise all argue on appeal that their convictions must be vacated because the statute and regulations governing false or fraudulent claims to Medicare are unconstitutionally vague and ambiguous. They contend that the rules

which allowed reimbursement only if an ambulance transport was medically necessary did not define that standard adequately and that their due process rights were consequently violated. PTS and Kevin Wise contend their convictions for double billing for mileage when two patients were transported in one ambulance should be overturned because no statute or regulation explicitly prohibited that practice. Kevin Wise also claims that the district court erred by not telling the jury that its instruction on deliberate ignorance did not apply to him and by not instructing the jury on entrapment by estoppel.

A.

The statute governing reimbursement provides that Medicare will pay for "ambulance service where the use of other methods of transportation is contraindicated by the individual's condition, but . . . only to the extent provided in regulations." 42 U.S.C. § 1395x(s)(7). The limiting regulation in place before 1999 said that payment would be made only if "[o]ther means of transportation would endanger the beneficiary's health." 42 C.F.R. § 410.40(b) (1998). Effective February 24, 1999, the regulation said that for nonemergency situations, "the following criteria must be met to ensure that ambulance transportation is medically necessary: (i) The beneficiary is unable to get up from bed without assistance. (ii) The beneficiary is unable to ambulate. (iii) The beneficiary is unable to sit in a chair or wheelchair." 42 C.F.R. § 410.40(d) (1999).

An argument made by PTS, which Wallace and Wise also adopt, rests on the assumption that this case is governed by the regulation in place before 1999 because the indictment uses its terms and because notice of the new regulation was not distributed to PTS and other providers until after the relevant period. For purposes of these appeals, we will assume without deciding that the pre1999 regulation governs. PTS also asserts that the governing statute and regulation provided no

comprehendible standard for providers to follow and that the concept of medical necessity is subjective.

PTS asserts that its claim of vagueness and ambiguity is supported by the fact that its own interpretation of the statute and pre1999 regulation is reasonable although contrary to the government's. The statute refers to "other methods of transport" being contraindicated, and the regulation refers to "other means of transport" endangering the beneficiary's health. Neither the statute nor the regulation specifies what is meant by other methods or means of transportation. A literal reading of these provisions, PTS submits, would indicate that ambulance service is appropriate and reimbursable if any other means of transport could possibly endanger the beneficiary's health. PTS claims that under a plain language interpretation of the statute and regulation, a provider should be reimbursed for providing ambulance service if transport by foot, motorcycle, or horseback "is contraindicated" or "would endanger the beneficiary's health." In its brief PTS characterizes this interpretation as "entirely reasonable."

These points advanced by PTS are not persuasive. Its interpretation is not reasonable and strains common sense. We cannot assume that it was the intent of the drafters that a person who cannot go to a medical appointment on horseback without suffering ill consequences is necessarily entitled to ambulance transport. We also disagree with the claim that the statute and the pre1999 regulation provide no guidance to providers or that the standard is unworkably subjective. While it is true that the version of the regulation that became effective in February 1999 is more objective and clear, the older regulation provides enough notice to comport with due process. Providers of ambulance transportation can be presumed competent to assess when "[o]ther means of transportation would endanger [a patient's] health." See 42 C.F.R. § 410.40(b) (1998).

Vagueness challenges that do not involve First Amendment freedoms are examined in light of the facts of the case. See Chapman v. United States, 500 U.S. 453, 467 (1991). Evidence was submitted to the jury that PTS repeatedly made statements which were false under any definition of the terms used, such as the patient was bed confined, the patient was moved by stretcher, and ambulance transport was medically necessary. These statements were false just like those made in United States v. Huntsman, 17 F.3d 1136, 1138 (8th Cir. 1994), where individuals claimed to be rice producers despite not meeting either relevant definition of the term. Although the pre1999 regulation allowed for some gray area in interpretation, there is no subjectivity involved when a patient supposedly confined to her bed can walk in and out of her home without assistance or when a patient supposedly using a stretcher rides in the front seat of the ambulance.

PTS relies on the definition of medical necessity that appears in the 1999 regulation, which it otherwise insists is inapplicable to this case, to argue that bed confinement and stretcher use are factors relevant for determining medical necessity. According to PTS, evidence about these factors has no other relevance in a prosecution for false claims. We disagree, for we conclude that statements regarding bed confinement and stretcher use are also relevant factors for determining whether other means of transportation would "endanger the beneficiary's health," a determination required for reimbursement under the pre1999 regulation.

After considering the arguments raised, we conclude that the statute and regulation governing Medicare reimbursement for ambulance transport are not unconstitutionally vague and ambiguous.

B.

PTS and Kevin Wise also argue that double billing for mileage when patients were double hauled was not prohibited by law at the time. The government contends

that in addition to containing false statements regarding bed confinement, stretcher use, and medical necessity, the claims associated with double hauling sought reimbursement for twice the mileage PTS was entitled to receive. According to the government, PTS should have prorated and split the mileage. It also argues that each claim falsely represented that only one patient had been transported. PTS's response that no regulation or statute explicitly proscribes this type of falsity does not resolve the issue.

The government asserts that double billing for a service that was only provided once is frequently prosecuted even without the benefit of explicit regulatory proscriptions. In United States v. Peterson, 223 F.3d 756, 762 (8th Cir. 2000), another prosecution brought under 18 U.S.C. § 287, we held that a mobile x-ray service which failed to prorate its transportation fee when serving several patients at one nursing home defrauded Medicare. PTS attempts to distinguish Peterson by saying that the defendants there knew their conduct was contrary to law so their overbilling scheme was intentional, while PTS and Wise had no notice that their practices were illegal. Evidence was presented at trial, however, that Arkansas Blue Cross and Blue Shield, which administered the Medicare claims, had policies against double billing mileage and that the defendants intentionally misled the insurance company by the way they submitted these claims. It was for the jury to decide if the defendants knew the claims they submitted were false. See 18 U.S.C. § 287.

PTS also relies on the September 1998 Medicare Providers Newsletter to support its contention that there was no national policy against double billing for mileage. A question was posed in that newsletter about what was described as a rare incident when two patients were transported in one ambulance. The questioner said that some Medicare carriers allow ambulance companies to bill the base rate for each patient, to cover the time for loading and unloading and caring for each, and then allocate the mileage for each patient. The question was whether there was a national policy governing such a situation. Medicare answered that no national policy existed

but that it had advised that double payment is not due when the ambulance is going to one destination. Arkansas Blue Cross administrators testified at trial, however, that they did have a policy against this practice and that they instructed Arkansas providers accordingly. Moreover in the newsletter hypothetical, the mileage was said to have been "allocated" by the provider, suggesting that it was prorated. Perhaps most significant is the fact that the hypothetical did not directly address a situation like the one here, where PTS misrepresented the service it provided with claim forms that falsely reflected the transport of one patient for a certain distance. We conclude that these acts were a proper basis for conviction.

## C.

Kevin Wise argues that the district court erred by not excluding him from a general jury instruction on deliberate ignorance which said that "knowledge may be inferred if a defendant deliberately closed his or her eyes to what would otherwise have been obvious to him or her." He contends that the jury was presented with conflicting evidence about whether he had actual knowledge or no knowledge that the submitted claims were false, but that there was no evidence of "deliberate efforts on his part to avoid obtaining actual knowledge." See United States v. Barnhart, 979 F.2d 647, 651 (8th Cir. 1992). He claims that he tried to overcome his ignorance about acceptable billing practices by making repeated calls to Medicare and Blue Cross call centers for information. He claims that they instructed him to submit questionable claims and let the recipients sort out what was reimbursable.

We review the district court's decisions in giving the deliberate ignorance instruction for abuse of discretion. United States v. King, 351 F.3d 859, 866 (8th Cir. 2003). We will not reverse its decision to give the instruction "if the evidence, viewed in the light most favorable to the government, supports a finding that any ignorance was deliberate." United States v. Kellermann, 992 F.2d 177, 179 (8th Cir. 1993).

There was evidence at trial that Wise actually knew that the billing practice being used at PTS was not proper or deliberately avoided investigating whether it was. Cf. id. (jury could find actual knowledge or deliberate failure to make inquiry). The evidence indicates he had at least some knowledge of Medicare and Medicaid regulations. Wise testified that he asked questions of call center staff, he told an FBI agent that he thought a patient had to be confined to bed to receive reimbursable ambulance transport, and he instructed paramedics to have dialysis patients use stretchers. It could be inferred from the evidence that Wise had actual knowledge of what activity was reimbursable and how the claim forms should have been submitted or that he avoided learning more about proper billing. For example, a PTS clerk who doubted the propriety of double billing mileage asked Wise how to file the claims properly, and he told her to submit double claims for them. There is no indication in the record that he asked the call center staff about the clerk's question or otherwise researched the issue before giving his instruction. We conclude that the district court did not abuse its discretion by not telling the jury that the instruction on deliberate ignorance did not apply to Kevin Wise.

D.


Kevin Wise also argues that the district court committed reversible error by not instructing the jury on the affirmative defense of entrapment by estoppel. This defense can be used by a defendant who reasonably relied on a statement by the government which misled him into believing that his conduct was legal. Hood v. United States, 342 F.3d 861, 865 (8th Cir. 2003). Wise claims that representations from the Medicare call center led him to believe that it was appropriate to submit questionable claims. A criminal defendant is "entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." Mathews v. United States, 485 U.S. 58, 63 (1988).

-11-

We review de novo the district court's denial of Wise's request for an instruction on entrapment by estoppel. United States v. Benning, 248 F.3d 772, 775 (8th Cir. 2001). Wise testified that when he called the Medicare call center he was told to submit claims even if he had a question about the patient's diagnosis and Medicare would sort out what could be reimbursed. This evidence does not support a conclusion that Wise should have been acquitted on the four counts of his conviction; none of those counts concerned any question about the appropriateness of a diagnosis. The evidence presented at trial shows that PTS sought double reimbursement for mileage without indicating on the claim forms that two patients traveled together, thereby depriving Medicare of the opportunity to notice and correct the irregularity. The jury could also have convicted Wise on the basis of the other false statements on the forms – that two patients were bed confined, that patients were moved by stretcher, and that ambulance transport was medically necessary. Medicare would not have been able to tell on the face of the claim that reimbursement was not warranted. Since there was not plausible evidence that the government made any misleading statements on which Wise reasonably relied to his detriment, the district court did not err by declining to instruct the jury on the entrapment by estoppel defense.

III.

PTS appealed its sentence, and Wise challenged his sentence on his cross appeal filed after the government appealed his sentence and that of Wallace. The original arguments contended that the district court had erred in its application of the sentencing guidelines and in related findings. All three defendants later objected to the constitutionality of their sentences based on Blakely v. Washington, 124 S. Ct. 2531 (2004), either in reply briefs or supplemental briefing. After United States v. Booker, 125 S. Ct. 738 (2005), was decided, they filed a joint motion to remand for resentencing. We address that motion before outlining the other sentencing issues raised by the parties.

-12-

## A.

None of the defendants raised Sixth Amendment sentencing issues in the district court. Consequently, we review their claims under <u>Blakely</u> and <u>Booker</u> for plain error. <u>United States v. Pirani</u>, 406 F.3d 543, 549 (8th Cir. 2005) (en banc). We will not find plain error and remand for resentencing unless an appellant shows by a reasonable probability that the district court would have imposed a different sentence had it treated the guidelines as advisory instead of mandatory. <u>Id.</u> at 553. The defendants have not made such a showing here. Nothing in the record suggests that the district court considered the sentences it imposed under the mandatory guidelines system to be unreasonable or that it would have considered different sentences. <u>See</u> <u>id.</u> at 553 n.6. Finding no plain error, we decline the defendants' request under <u>Booker</u> to remand for resentencing.

## B.

We continue to review the district court's determination of the sentencing guideline range after <u>Booker</u> because this range must be calculated and considered with the other factors listed in 18 U.S.C. § 3553(a). <u>Booker</u>, 125 S. Ct. at 767; <u>United States v. Mathijssen</u>, 406 F.3d 496, 498 (8th Cir. 2005). We review the court's application of the sentencing guidelines de novo and its factual findings for clear error. <u>Id.</u> The ultimate sentence imposed is reviewed for unreasonableness based on all the factors in § 3553(a). <u>See</u> <u>id.</u>

### 1.

PTS appeals its $1,177,786 fine on three grounds. It argues that there was insufficient evidence to support the district court's finding of relevant conduct to enhance the sentence, that the fine is so high that PTS is unable to pay it, and that the court erred in finding PTS to be a criminal purpose organization.

-13-

Medicare and Medicaid actually lost approximately $13,000 by paying the claims involved in the twenty four counts on which PTS was convicted, but the government argued that the fine should be based on a total loss of $841,276. That figure includes the loss from all 2,568 claims involved in the conspiracy charge on which PTS was acquitted. At the sentencing hearing the government called as a witness the FBI analyst who had calculated the financial losses caused by PTS. The analyst testified that all 2,568 claims were made for ambulance transport of the twelve patients to and from dialysis treatment. Excluded from her loss calculation were claims for additional medical expenses and claims reflecting discharge from dialysis to a hospital instead of to the patient's home.

PTS argued at sentencing that because it had been acquitted of the conspiracy charge that encompassed all 2,568 claims and because inclusion of the whole loss amount as relevant conduct would have a substantial impact on its sentence, the district court should have used a clear and convincing standard of proof instead of a preponderance standard. It also argued that there was insufficient proof to support a finding of relevant conduct under any standard.

Chapter 8 of the United States Sentencing Guidelines Manual (U.S.S.G.) has a complex system for determining the size of a fine for a convicted organization. Applying a preponderance standard, the district court found PTS accountable for $841,276. PTS received a base offense level of 6 under U.S.S.G. § 2F1.1 for an offense involving fraud or deceit. The court then added 11 levels for a loss of between $800,000 and $1,500,000 and 2 levels for more than minimal planning, resulting in a total offense level of 19. The base fine under § 8C2.4(a) was $841,276, which was the amount of gain to PTS and of the loss it caused. In computing the culpability score for PTS under § 8C2.5, the district court added 2 points to the basic 5 which apply if an organization has more than 50 employees and an individual with substantial authority was involved. With a total culpability score of 7, § 8C2.6 provided a minimum multiplier of 1.40 and a maximum multiplier of 2.80. When

-14-

these multipliers were applied to the base fine of $841,276, the resulting fine range was $1,177,786 to $2,355,572. The district court sentenced PTS at the bottom of this range.

PTS argues that the district court erred by applying a preponderance standard and that the evidence was insufficient to support its findings. It contends that the district court only speculated about the condition of the patient on each of the 2,568 transports and that there was evidence that the patients were in ill health. Ambulance transport would have been medically necessary on days when the patients particularly struggled during dialysis it says, and the government witness at the sentencing hearing was unable to testify about patient condition during the transports. PTS also quotes the district court's comment that there might be "some lack of proof here as to each claim on each day."

We disagree with these contentions about the evidence. Although the twelve patients could have had bad days when they needed hospitalization or other care, the testimony of the FBI analyst at sentencing established that the 2,568 claims alleged in the indictment were limited to transports to and from routine dialysis sessions. In each instance the patient was discharged to home and did not receive medical treatment beyond dialysis. Even though this witness was a specialist in financial analysis who could not testify to the medical condition of each patient during the transports, there was other evidence about that at trial. Medical personnel from the treatment centers testified that these twelve patients did not need ambulance transport when they were going to dialysis and back home again. The court's comment that there might not have been the same level of proof for each individual transport was not equivalent to a finding that the government's proof was inadequate or a concession that its findings were not supported by the evidence.

Since we conclude that the evidence was sufficient to meet either a preponderance of the evidence or a clear and convincing standard, we need not

elaborate on the proper standard. See United States v. Brown, 156 F.3d 813, 817 (8th Cir. 1998) ("Even assuming, arguendo, that the clear and convincing standard applies, the government has met its burden of proof."). After oral argument on their appeals, the defendants cited as supplemental authority United States v. Pimental, 367 F.Supp.2d 143 (D. Mass. 2005) (acquitted conduct should be reviewed at sentencing under a reasonable doubt standard after Booker). Booker did not go that far, however, for the Supreme Court maintained the trial court's fact finding authority without setting a new standard. See Booker, 125 S. Ct. at 768-69; see also Pirani, 406 F.3d at 551 n.4.

PTS's second sentencing issue is that the district court imposed a fine it is unable to pay and that the court should have made specific findings about its ability to pay a fine as required under United States v. Walker, 900 F.2d 1201, 1206 (8th Cir. 1990). PTS argues that the presentence report (PSR) shows it had substantially encumbered assets, for the PSR reports it had an insubstantial net income in 2000 and net operating losses in 2001 and 2002. The court should have realized from this information that PTS could not pay a large fine it argues. The government responds that PTS forfeited this argument by failing to raise it below or, in the alternative, that PTS waived the argument when it stated at sentencing that it did not object to the financial information represented in the PSR.

A defendant's financial resources and the burden that a fine will impose on it should be considered in imposing a fine. 18 U.S.C. § 3572(a); see also U.S.S.G. § 8C3.3 (amount of fine may be reduced if an organization is unable to pay the guideline fine). The sentencing court must make specific findings on the record which show that it considered the defendant's ability to pay the fine and its burden on the defendant. Walker, 900 F.2d at 1206. The district court failed to make such findings here, and the financial information in the PSR suggests that PTS may not be able to pay the large sum assessed against it. The government asserts that PTS forfeited or waived this issue. At the sentencing hearing defense counsel stated that

-16-

PTS had suffered losses in recent years attributed to legal expenses and that these losses should be a factor in the court's consideration of the corporation's ability to pay a fine. It does not appear that counsel's statement that PTS did not object to the financial information in the PSR is inconsistent with its argument on appeal that the information was correct and that the district court should have understood that a lower fine should be imposed. We conclude that the issue has been preserved for appeal and that the fine imposed on PTS is not supported by sufficient findings. PTS's sentence must therefore be vacated and remanded for further consideration and findings.

PTS also claims that the district court based its sentencing decision in part on an erroneous finding that PTS is a criminal purpose organization. In the written judgment a box was checked next to the statement that "the defendant organization is a criminal purpose organization pursuant to U.S.S.G. § 8C1.1." Section 8C1.1 provides that fines for criminal purpose organizations should divest them of their assets, and PTS suggests the court was influenced by this guideline in setting the amount of its fine even though it is in fact a legitimate business.

It does not appear from the record that the district court chose to treat PTS as a criminal purpose organization. The PSR did not make such a recommendation, and the district court made no such finding at the sentencing hearing. Moreover, another box on the judgment form was checked by the statement "the court adopts the factual findings and guideline application in the presentence report." Although it appears that the criminal purpose box was checked in error, the district court should make its findings in this respect clear on remand.

2.

Kevin Wise argues on his cross appeal that there was insufficient evidence to support the district court's use of relevant conduct to increase his offense level. The

four claims on which his convictions were based cost Medicare approximately $4,200, but he was held responsible for the $841,276 total loss claimed by the government for an eleven level increase under U.S.S.G. § 2F1.1(b), as opposed to only one level for a loss of $4,200. The total loss figure affected the length of his imprisonment and the size of his fine under § 5E1.2. Wise contends that the district court erred by using a preponderance standard and that there was no evidence to connect him to its finding of relevant conduct. We conclude for reasons similar to those already discussed that there was sufficient evidence to support the court's findings on relevant conduct and that it did not err by enhancing Wise's sentence on that basis.

The government appeals the district court's finding that Wise had accepted responsibility, which entitled him to a two level reduction under U.S.S.G. § 3E1.1. The district court conceded at the sentencing hearing that it is unusual to grant an acceptance of responsibility reduction when a defendant has gone to trial but found Wise merited the adjustment because his testimony about how PTS was managed was the basis for its findings about relevant conduct. The court also noted that Wise had cooperated with investigators and that part of his reason for going to trial was to establish the correct loss amount. The government objects that Wise denied the essential elements of guilt, expressed no remorse, and denied making any false statements. It argues that there is a difference between taking responsibility for managing a company, as Wise did, and taking responsibility for committing crimes which he did not.

We review for clear error the finding that a defendant accepted responsibility. See United States v. Waldman, 310 F.3d 1074, 1079 (8th Cir. 2002). While it is true that Wise contested issues like the loss amount and constitutionality of the statute and regulations and that he met with investigators, he never admitted to the court or jury that he had made any false claims. Even if he accepted responsibility for billing practices used at the company, he never accepted responsibility for his offenses as

U.S.S.G. § 3E1.1 requires. We conclude that on this record it was clear error to find that Wise accepted responsibility. We therefore vacate his sentence and remand for resentencing.

3.

The government appeals three aspects of Wallace's sentence: the district court's decision not to apply an enhancement for managing or supervising, its decision not to attribute relevant conduct to her for all 2,568 claims referenced in the indictment, and its decision not to apply an enhancement for more than minimal planning.

Wallace moved to mitigate her sentence for minor role while the government sought to enhance it for managing or supervising role. The court denied both motions. It denied the government's motion under U.S.S.G. § 3B1.1, because it found that despite her job title Wallace functioned more as a clerk than as an office manager and that everything she did was at Wise's direction. The government points out that Wallace worked for ten years as the office manager of PTS; she supervised all of the office workers, including the two billing clerks who filed claims. She was also the one who prepared the transfer forms that were used to generate the claim forms, and the government disputes the finding that Wallace followed Wise's direction.

The district court's determination of a defendant's role in an offense is a factual finding reviewed for clear error. See United States v. Fairchild, 122 F.3d 605, 613 (8th Cir. 1997). The evidence supports the district court's assessment of Wallace's position in PTS relative to Wise and to those who took work direction from her. Wise testified that he was responsible for the billing operations, and Wallace appears to have taken direction from him and relayed it to the clerks instead of working collaboratively with Wise. There is admittedly some evidence supporting the government's argument – just as there is evidence supporting Wallace's claims that

she had a minor role – but we do not conclude that the district court clearly erred in interpreting the evidence as it did.

At sentencing Wallace was held accountable for the $24,600 loss associated with the claims for the transport of Phyllis Warren, one of which was the basis for Wallace's single count of conviction. None of the claims related to the transport of the eleven other patients was attributed to her. The government argues that Wallace should have been held responsible for the $841,276 loss associated with transporting all twelve patients. The district court rejected this argument at sentencing, finding that the government had not met its burden to prove that Wallace had the knowledge or intent to defraud in respect to all of the claims. On appeal the government argues that she worked in tandem with Wise and points out that she told an FBI agent that she was familiar with the criteria for reimbursable ambulance transport and believed a patient had to be confined to bed to qualify for that service. The government also asserts that Wallace knew that the information she represented might turn out to be false since she prepared transfer forms in advance. After studying the record, we are not persuaded that the district court clearly erred in determining that Wallace lacked the knowledge or intent to be held liable for all of the charged conduct.[1]

We conclude that the district court did not err in calculating Wallace's sentence under the guidelines and that her sentence is not unreasonable. The imposition of

---

[1]Because of this conclusion we need not address another contention made by the government. It argues that an additional enhancement for more than minimal planning should be applied. The 2003 guidelines under which Wallace was sentenced do not provide an enhancement for more than minimal planning, but the 1998 guidelines would apply if Wallace were held responsible for $841,276 the government says, because they would then be more advantageous for her even with an enhancement for more than minimal planning.

community service reflects Wallace's relatively limited role in the offense and her financial circumstances.

## IV.

Accordingly, we affirm all the convictions and the sentence imposed on Shirley Wallace. We reverse the sentences imposed on Patient Transfer Service, Inc. and Kevin Wise and remand for resentencing as explained in Parts III B 1 and 2 of the opinion. The joint motion for remand based on United States v. Booker is denied.

_____